**WINTER v. MORGAN & WILLIAMS.**
(No. 2213.)

(Court of Civil Appeals of Texas. Amarillo. Nov. 21, 1923.)

**1. Principal and agent 123(8) — Evidence held insufficient to show agency to list.**

In action by brokers to recover commission for exchange of property, evidence *held* insufficient to show that defendant's father was authorized by him to list the property with plaintiffs.

**2. Principal and agent 19—Law never presumes agency.**

The law never presumes agency; it is always a fact to be proved, and the person who alleges it has the burden of proving it by a preponderance of the evidence.

**3. Principal and agent 23(2)—Circumstantial evidence may establish agency.**

Agency may be established by circumstantial evidence, but the evidence must be traceable to the alleged principal and must have a legal tendency to establish it.

**4. Evidence 594 — Uncontradicted evidence cannot be rejected.**

Where evidence is not contradicted directly or circumstantially, the jury cannot reject it and find to the contrary.

**5. Principal and agent 169(3)—Listing with brokers by father held not ratified.**

Where owner's father without authority listed property for sale or exchange, and the owner did not know of brokers' services until negotiations were completed, at which time he denied his liability to brokers and informed them that they must file their claim for commissions against his father's estate, there was no ratification or estoppel entitling brokers to commission.

**6. Brokers 86(7)—Evidence in action for commission held to show violation of rule of uberrima fides.**

In an action for commission for services in exchange of property, evidence *held* to show that plaintiffs were not entitled to recover because they violated the rule of uberrima fides.

Error from District Court, Deaf Smith County; Reese Tatum, Judge.

Action by Morgan & Williams against B. A. Winter. Judgment for plaintiff, and defendant brings error. Reversed and rendered.

Carl Gilliland, of Hereford, for plaintiff in error.

W. H. Russell, of Hereford, for defendants in error.

---

For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

HALL, C. J. Defendants in error, plaintiffs below, sued B. A. Winter, to recover certain commissions alleged to be due them as real estate and cattle brokers. The substance of the petition is that on or about June 30, 1921, the defendant Winter, acting through his father, J. C. Winter, listed with them section 26, in Deaf Smith county, together with a number of cattle, authorizing them to either sell or exchange said property for other property and agreeing to pay them a commission of 5 per cent. in case of sale or 2½ per cent. on the exchange value of said property in the event of an exchange. It is further alleged that on or about September 1st the plaintiffs procured one J. B. Davis, who owned a hotel in Potter county, known as the Reed apartment house, that they introduced Davis to the defendant and showed Davis the land and cattle in Deaf Smith county, and that defendant's father, J. C. Winter, as agent for him, began negotiations with Davis for the exchange of their respective properties, which said exchange was consummated on or about January 12, 1922, at an agreed value of $45,000, for the defendant's property. It is further charged that after the defendant's father, J. C. Winter, and the said Davis, opened negotiations for said exchange, that defendant, with full knowledge that his property had been listed with the plaintiffs by his father, under an agreement to pay a commission, and with knowledge of the efforts and services on the part of plaintiffs, consummated said deal with Davis and thereby ratified and confirmed all the acts of his said father and accepted and received the benefits accruing from the efforts of plaintiffs in effecting said exchange. The petition further charges in the alternative that, if plaintiffs are in error as to an express agreement to pay commissions, then that 2½ per cent. on the exchange value of the defendant's property is a reasonable and customary commission and is the usual commission charged and paid in such transactions and that said custom was known both to the defendant and his father, J. C. Winter. The defendant answered by general demurrer, several special exceptions and general denial. After both sides had closed in the introduction of the testimony, plaintiff in error requested the court to peremptorily instruct a verdict in his favor. This request was denied, and the case was submitted to the jury upon a general charge, resulting in a verdict in favor of the plaintiffs below in the sum of $437.50.

Under several propositions the plaintiff in error insists that the court erred in submitting the issue of agency on the part of the father in listing the property with defendants in error, where there is no evidence that the father ever assumed to act for plaintiff in error as his agent, and that the court further erred in refusing to direct a verdict in his favor because there is no evidence that the father was authorized by plaintiff in error to act for him, and it is insisted in this connection that the uncontroverted evidence shows that the father did not assume to act for the plaintiff in error, and that he had no authority from plaintiff in error to employ the defendants in error. The statement of facts discloses that the section of land in question had been purchased by J. C. Winter, the father of plaintiff in error; that later he sold it to plaintiff in error because he was not able to pay for it, and that during the summer of 1921 he lived upon the land, looking after it for his son and grazing some cattle that belonged to the father, but there is no direct evidence showing that J. C. Winter had any authority to contract for the sale of the land either directly with any purchaser or indirectly through brokers. Plaintiff in error testified that he never authorized his father at any time to sell the land for him or to employ any agents to sell it, and he stated that he did not know that the defendants in error had been employed by his father to procure a purchaser or to negotiate for an exchange of the land until after he had agreed upon the terms of exchange with Davis, and was at the depot in Hereford on his way to Amarillo to consummate the sale. His testimony upon that point is:

"The first time I ever met Morgan & Williams was after Davis and I had met in Amarillo and had come to Hereford and inspected the land and traded and was at the depot in Hereford just as we were getting on the train to go back to Amarillo, and as I was getting on the train a man by the name of Spencer brought Mr. Williams and introduced him to me, but I do not know whether Morgan was present at that time or not. Before meeting Williams at the depot I had never heard of either Williams or Morgan. At the time I met Williams at the depot Davis and I had made a trade, subject to his approval on inspecting the cattle, and he was satisfied with them upon inspection. After Spencer introduced Williams to me at the depot Williams asked me if I had traded my land out here, and I told him I had, and he asked me what I was going to do about the commissions, and I asked him who I owed a commission to, and he said to himself and Mr. Morgan, and I told him I didn't know anything about that. He told me that my father had listed it with him for sale and I told him that if my father had listed it with him for sale that I supposed he would have an action against my father's estate. I had never authorized my father to employ Morgan & Williams or anybody else to sell this property for me, and never heard that he had done so until Williams told me he had at the depot in Hereford in the conversation I have just testified about. Mr. Davis was with me at the depot in Hereford, and after we got to Amarillo we closed our deal by exchanging our equities; that is, I exchanged my equity in the Deaf Smith county land for his equity in the Amarillo property. When I saw Williams at the depot I don't believe Davis and I had entered into a written contract, and at the time we finally

closed the deal in Amarillo I knew Williams was claiming a commission. Since my memory has been refreshed I will state that Davis had already inspected the land, and he and I had signed a contract in C. B. Reeder's office in Amarillo before coming to Hereford, and we were coming down for him to look at some heifers I had bought from Shore, which were to go in the deal but subject to his inspection, and being satisfied with the heifers we closed our deal on our return to Amarillo. My father did not have any authority from me to list the land with real estate agents or anybody else and employ them to sell it for me and my father. We never discussed that matter at all; neither did my father have any authority from me to represent me in the sale of this land or to employ agents for me to help sell it or agree to pay agents a commission for me; neither did I have any arrangement with my father for him to try to sell the land. In fact, he was arranging to come to Albuquerque just before he died.

"Q. Your father was not representing you in any sense of the word out there? A. He was representing me in the sense that if he had gotten a good deal that suited me I would have taken it.

"Q. How did he ever learn that fact? A. Well, I don't know whether he ever learned it or not; my father knew that I was not a farmer, and I suppose he thought I would be glad to get rid of the property, and if he thought that he thought correctly.

"Q. You had an indistinct understanding that whatever your father did about selling the land would have been satisfactory with you? A. Provided the deal suited me.

"Q. It would have been all right for your father to have gone down and employed agents to sell the land? A. Yes; it would have been.

"Q. It would have been all right for him to have promised to pay a commission? A. Yes, sir; it would have been.

"Q. To that extent your father had authority? A. Yes, sir; I don't mean I had authorized my father to employ agents to represent me in selling the land for me; I meant that it would have been all right for him to represent me if he had gotten a trade that was satisfactory to me."

Williams testified in part that the father came into his office and listed the land with his firm for sale; further testifying he said:

"He gave us a full description of the land and incumbrances on the land, and told us just what was against it and what he wanted for it, and said he would trade it for some income paying property, and said that in case we could make a trade he would take back the notes and carry the difference."

With reference to the conversation at the depot in Hereford, Williams testified in part as follows:

"I learned that B. A. Winter, the defendant, had traded with Davis; I learned this on the day I met B. A. Winter at the depot at the time he testified about. That was the first time I had ever met B. A. Winter, and Mr. Spencer introduced me to him, and I introduced my partner, Mr. Morgan, to him. I told him we had come down to see if they had made a trade. I asked him if he had traded, and he said he was trading and I told him that we were the parties in the real estate business that negotiated the trade and carried Davis to see the farm. I told him we had been working on this little trade for some time and somebody owed us a commission of 2½ per cent. on the value of the property, and I told him his father had listed the land with us. He didn't say anything about his father having any right to list the land with us but said, 'Gentlemen, I guess about the best thing for you to do would be to put in a claim against the estate.' In the conversation at the depot he didn't say that he did or did not owe the commission. He said in regard to paying the commission himself he did not think he owed it. In the conversation at the depot I told defendant that his father had listed the property with us and had agreed to pay us a commission, and he said that if that was the case he did not owe us any commission but that his father would owe it, and that we would have to file our claim with the administrator of the estate. That was about the substance of the conversation and about all that occurred at that time."

[1-4] E. W. Morgan also testified that, when his partner Williams told the appellant that the father, J. C. Winter, had listed the property with his firm, appellant said that if there was any commission due the appellees that they would have to file their claim with his father's estate. This evidence is wholly insufficient to show that J. C. Winter was authorized by the appellant to list the property with appellees for sale. The law never presumes agency; it is always a fact to be proved, and the person who alleges it has the burden of proving it by a preponderance of the evidence. 1 Mechem on Agency, §§ 255, 298. The burden is also upon him who alleges agency to prove the nature and extent thereof. 2 C. J. 919, § 647; Id. 923, § 662; Id. 925, § 665; Stratton-White Co. v. Castleberry, 15 Tex. Civ. App. 149, 38 S. W. 835. The court charged the jury that agency, like any other fact, could be established by circumstantial evidence. This is true, but the evidence must be traceable to the alleged principal, and must have a legal tendency to establish it. 1 Mechem Agency, 261; Stratton-White Co. v. Castleberry, supra. No prior authority on the part of appellant to his father to list the land with appellees or any other agency was shown, and the mere fact that J. C. Winter was the father of the appellant is not sufficient, standing alone, to authorize the presumption of agency. The appellant having flatly denied the authority of his father to list the property with appellees, and to engage their services in making the exchange, and there being no evidence, direct or circumstantial, tending in any way to contradict this evidence, the jury could not reject it and find to the contrary. When the testimony of appellant is eliminated, there is no proof which would warrant the submission of the issue to the jury. Starkey v. H. O. Wooten

Grocery Co. (Tex. Civ. App.) 143 S. W. 692; Van Cleave v. Walker (Tex. Civ. App.) 210 S. W. 767; West Texas National Bank v. Wichita Mill & Elevator Co. (Tex. Civ. App.) 194 S. W. 835. The Supreme Court said, in Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059:

" 'Whether there be any evidence is a question for the judge; whether sufficient evidence, is for the jury.' * * * The correctness of this proposition is generally admitted, but great difficulty has been experienced in determining the exact legal meaning of the phrase 'any evidence.' * * * 'It was formerly considered necessary in all cases to leave the question to the jury if there was any evidence, even a scintilla, in support of the case; but it is now settled that the question for the judge (subject, of course, to review) is, as stated by Maule, J., in Jewell v. Parr, 13 C. B. 916, not whether there is literally no evidence, but whether there is none that ought reasonably to satisfy the jury that the fact sought to be proved is established;' and held that plaintiff could not recover of a minor for a goblet valued at £15, and a pair of ornamental stud buttons valued at £25, the former being, within the knowledge of plaintiff at time of sale, intended by the minor as a present to a third person, there being no evidence offered by plaintiff that such articles were necessaries in the particular case, and set aside the verdict and judgment in favor of plaintiff and entered a nonsuit. In Wittkowsky v. Wasson, 71 N. C. 454, the court, in speaking of the meaning of the phrase 'any evidence,' say: 'Did it mean the slightest scintilla of evidence, or such only as that from which a jury might reasonably infer the existence of the alleged fact? The latter view has been adopted in this state and in England, and, so far as my researches have extended, in other states generally.' In Hyatt v. Johnston, 91 Pa. St. 200, it is said: 'Since the scintilla doctrine has been exploded, both in England and in this country, the preliminary question of law for the court is, not whether there is literally no evidence, or a mere scintilla, but whether there is any that ought reasonably to satisfy the jury that the fact sought to be proved is established. If there is evidence from which the jury can properly find a question for the party on whom the burden of proof rests, it should be submitted; if not, it should be withdrawn from the jury.' "

Judge Denman in the Joske Case further discusses that question, quoting from numerous authorities, and concludes as follows:

"We are then called upon to determine whether the testimony in this case does more than to create a mere surmise or suspicion that Joske 'requested or directed' Irvine's arrest. We think it does not, if it can be said to go that far."

[5] Ratification and estoppel cannot arise under the undisputed facts before us. In the case of Graves v. Bains, 78 Tex. 92, 14 S. W. 256, the Supreme Court held that Shockley, who was a part owner of the land for the sale of which Bains was suing for commissions, was bound because it was shown that when he was informed of the employment of Bains to sell the land he did not object to it or repudiate it, and that his conduct in consummating the sale was an acquiescence in the employment of Bains by Graves, and was equivalent to an affirmance of the contract of employment. He accepted the proceeds of the sale, after notice that Bains was making it, thus adopting the contract of agency with full knowledge of all the facts. No such condition exists in the instant case. The appellant's testimony shows that he never heard of Williams & Morgan prior to the conversation with them at the depot in Hereford, and, upon being informed that his father had listed the land with them, he repudiated his father's agency and denied his own liability by informing the appellees that they would have to file their claim for commissions against his father's estate. A similar state of facts is found in the case of J. B. Watkins L. M. Co. v. Thetford, 43 Tex. Civ. App. 536, 96 S. W. 72. The uncontradicted evidence in the instant case shows that the appellant had closed the deal with Davis in Amarillo, subject to the acceptance by the latter of the cattle. After the contract had been executed they went to Hereford together and inspected the cattle, and, Davis having been satisfied with such inspection, they were returning to Amarillo and were at the depot at Hereford, waiting for the train, when knowledge of the fact that appellant's father had listed the property with appellees was first brought home to appellant. He immediately denied his liability, which takes the case out of the rule announced in the authorities just cited. The only thing which remained to be done between the parties to consummate the deal was the execution and exchange of deeds. Since there was neither direct nor circumstantial evidence tending to show the authority of J. C. Winter to list the property, or that B. A. Winter had ratified the act of his father, or was estopped from denying his father's agency, the peremptory instruction requested by appellant should have been given.

[6] The appellant further insists that the judgment is erroneous because the evidence shows that, even if the relation of principal and agent had been established, the appellees are nevertheless not entitled to recover because they have violated the rule of uberrima fides. We strongly incline to the opinion that this contention should be sustained, because it appears that the appellees had a business arrangement or connection with one Hacker, who was representing Davis in the transaction, as the agent of the latter, Williams testified:

"We had a transaction up with J. B. Davis some time near September, 1921; Emerson Hacker brought him to our office, which was the first time I had met Davis. Hacker introduced Davis to myself and Morgan and told us he had a proposition of a business property

in Amarillo which he would want to trade for Texas land."

The evidence of Williams further shows that he, Hacker, and Davis drove out and inspected Winter's property. He further testified:

"Morgan and I had an agreement with Hacker in regard to bringing people to us. Hacker came in and told me that he was going to Amarillo and down to Clarendon, and that he would be out a while, and that he wanted to look up some prospective buyers for real estate trade and would like to work with us, and we told him that would be all right and arranged with him to work with us. He was to bring us purchasers; that is, he was to work for us, and we were to pay him for his services a certain per cent. of the commissions in case we made sales to or trades with the purchasers he brought to us, and Hacker brought Davis to us under this agreement."

He testified further:

"I never talked with Davis any more after he left Hereford for Amarillo; I left that up to Hacker."

Upon this question Hacker testified as follows:

"In the late summer or early fall of 1921—I think in September—Mr. Davis was looking for a trade. I met him in Amarillo and brought him from there to Hereford, and after we got to Hereford we went to the office of plaintiffs, and I introduced Davis to Morgan and Williams, and Mr. Williams, his brother. Davis and I got in a car and went to the Winter farm west of Hereford, and there met J. C. Winter. We then came back to Hereford in the afternoon and the next morning J. C. Winter and I went with Davis to Amarillo to inspect the Davis property there. At the time I met Davis in Amarillo and brought him to Williams & Morgan at Hereford, Williams & Morgan and I were working together and for each other; I was taking care of my end of the trade, and they were taking care of their end of it, and we were acting for each other in the matter. I was representing Mr. Davis in the trade."

We believe this testimony shows such a business arrangement between Hacker and the appellees as to come within the rule prohibiting agents from representing both parties in a sale or exchange of property.

For the reasons above stated, the judgment is reversed, and is rendered for the appellant.