## MILLER et ux. v. PANHANDLE & S. F. RY. CO.

### No. 3486.

Court of Civil Appeals of Texas. Amarillo.

Nov. 26, 1930.

Rehearing Denied Feb. 4, 1931.

Bean & Klett, of Lubbock, for appellants.

Terry, Cavin & Mills, of Galveston, Madden, Adkins, Pipkin & Keffer, of Amarillo, and Wilson, Randal & Kilpatrick, of Lubbock, for appellee.

HALL, C. J.

J. K. Miller and wife, Mrs. Tinie Miller, sued the Panhandle & Santa Fé Railway Company, alleging, in substance: That on or about August 23, 1928, while traveling on state highway No. 7, they undertook to cross appellee's railroad track about two miles north of Justiceburg in Garza county. That at said point said highway and line of railway are parallel running northwesterly and southeasterly. That, in going in a southeasterly direction and before reaching the crossing in question, the highway is on the south side of the railroad. That beyond the crossing and southeast thereof the highway is east of the railroad. That highway No. 7 is about 80 feet wide where it crosses appellee's right of way, and that the right of way is 100 feet wide north of the crossing and 200 feet wide south thereof. That, in crossing the railroad, the highway makes what is called a letter "S" double curve. That, where said highway crosses the appellee's right of way, appellee did not make and maintain an opening or crossing through its right of way 80 feet wide, equal to the width of the highway, nor was such crossing 30 feet wide, but, on the contrary, was only 16 feet in width. That appellee made and permitted a large and dangerous hole to remain on said crossing upon its right of way 6 or 8 feet deep, about the same width, and greater in length. That said hole was at or near the center of the railroad crossing on appellee's right of way and had been there for many months without any effort on the part of appellee to fill it. That said hole is without any guard or warning to keep travelers from running into it except a two-rail guard about 3½ feet high and about 16 feet long, which said guard is on the edge and north side of said hole;

there being no guard on the other side of the hole. That said guard rail set out nearly in the middle of said crossing, and that, in order to avoid said hole, it is necessary for one to bear considerably to the left, and that the guard rail is a false and deceptive guard and suggests to the traveler that he go to the right thereof. That, on the date above mentioned, about 4 o'clock, a. m., plaintiffs were traveling upon said highway in the dark, and undertook to cross over said railway in their Chrysler five-passenger sedan, going in an easterly direction at a speed of 14 or 15 miles per hour and without notice or warning of the alleged dangerous condition of the crossing, and, in undertaking to follow the highway, they were misled by said guard rail and drove into said hole, overturning the automobile, seriously injuring the plaintiff Mrs. Tinie Miller, and damaging the automobile. The petition describes the injuries sustained by Mrs. Miller, and details the damages resulting to the automobile.

The acts of negligence charged are, in substance, as follows:

(1) That appellee was negligent and violated the laws of Texas in the construction, maintenance, and operation of its roadbed and right of way where it crosses said highway at the point in question, in that appellee did not place and keep the crossing in proper condition for the use of the traveling public.

(2) Appellee did not make and maintain an opening or crossing through its right of way and over its road and through its right of way fence a width equal to that of the 80 feet highway.

(3) Appellee did not make and maintain a crossing of the statutory and reasonable width of 30 feet, but, on the contrary, the crossing was only 16 feet wide.

(4) That the crossing was not made and kept in such condition as to permit of the free and easy passage of vehicles, as required by law and demanded by ordinary prudence and skill.

(5) That appellee was negligent and grossly careless in the construction and maintenance of the sluices, culverts, and ditches in and upon the roadbed and right of way within said crossing, in that appellee made and permitted a large and dangerous hole on said crossing upon the right of way about 6 or 8 feet deep and about the same width and of greater length, said hole being near the center of the railroad crossing on appellee's right of way, and that appellee made no effort to remove or fill it or to eliminate the danger created thereby.

(6) That said hole. was without guard or warning to keep travelers from running into it, except a two-rail guard about 3½ feet high on the north side of the hole, and that there was no guard on the east or west sides of the hole to keep one from driving into it.

(7) That the guard rail sets out in the middle or nearly the middle of said crossing, and, in order to avoid the hole and prevent collision with the guard rail, it is necessary for one to bear considerably to the left and out of the natural course and the rail is a false and deceptive guide which leads to the right thereof and into the hole instead of to the left.

(8) That appellee was guilty of negligence and gross carelessness and a violation of the laws of Texas in the construction, maintenance, and operation of said right of way and roadbed within said highway crossing and in allowing and permitting the conditions above described, all of which appellee knew or should have known by the use of ordinary care.

Defendant answered, in substance: That the opening in its right of way at the point in question is 80 feet in width, conforming to the prescribed width of the highway. That said 80-foot strip is public property, and is not the private property of defendant, nor was it at the time of the accident in question. That all portions of said right of way were the property of the public, subject to the right of defendant to cross the same as permitted by law. That, where said highway crosses defendant's railroad, it was graded, and the traveled and used portion thereof was about 16 feet wide on the crown of the road. That the approaches of the graded and used portion of said highway where it crosses defendant's rails were of the same uniform width and condition as the other portions of said roadway, and the elevation and grade of the road on said approaches conformed to the elevation and grade of the road off the right of way. That defendant had provided a smooth planked crossing for said highway of the width of the graded and used portion thereof, as graded and maintained by the state and county authorities. That, in conforming the highway at the crossing point to the width on both sides of the crossing, defendant used due care and complied with the requirements of the law as to keeping that portion of its roadbed in the same condition as the traveled and used portion of said highway. That the law imposed the duty upon defendant to provide for and not interrupt natural drainage along its right of way. That at the crossing there was a culvert under the highway which was not on any portion of defendant's right of way, but which extended under the highway off of the right of way and emptied at a point northeast of defendant's right of way, and that water flowing naturally onto the right of way washed out a drainage ditch which ran over it, and defendant was forced, in the exercise of ordinary care and in order to comply with the law, to install a sluice or culvert under the highway as it approached the rails at said crossing, so that drainage would be pro-

vided for the protection of both the track and the highway. That the drainage so provided followed the natural direction of drainage. That such culvert was reasonable and necessary to keep the crossing in good condition for the use of the traveling public. That defendant installed a drainage pipe, which discharged the flowage into the natural channel on the northeast side of the crossing.

Defendant pleaded that plaintiffs were guilty of contributory negligence in the following particulars:

(1) That their automobile was being driven at a high and dangerous rate of speed, early in the morning and before daylight. That the automobile was without lights and was being driven at such a dangerous rate of speed that in approaching the crossing plaintiffs could not take the curve and turn so as to go over the railroad to the left of the grade, and, as a result, their automobile left the graded and·used portion of the highway, running into the rough and ungraded portion of the right of way where the rails and ties of the track were exposed. That, had plaintiffs exercised ordinary care, the driver of the car could have kept it on the traveled and graded portion of the road, and that running the car at that point, at such a rate of speed, under the circumstances, was negligence.

(2) That at a point about 800 feet from the crossing, there was a plain and readable sign advising plaintiffs of the curve in the highway at the crossing, but, despite such warning, plaintiffs continued to drive at a high rate of speed until it was too late to stop at the curve, and such failure to heed the warning sign was negligence on the part of plaintiffs.

(3) That plaintiffs were negligent in failing to slow down in approaching the crossing.

(4) That the failure to have the lights burning on the car was negligence.

(5) That the brakes were not in good operating order and were not properly operated by the driver and occupants of the car, and the car could not, therefore, have been stopped when it was discovered that it was leaving the road. That the condition of the brakes and the failure to operate them constituted negligence.

(6) That plaintiffs were negligent in failing to keep a proper lookout.

(7) That the occupants of the car were on a joint enterprise and joint venture at the time of the accident, and the driver was under the control and direction of plaintiffs and failed to exercise ordinary care, and the negligence of said driver was the negligence of plaintiffs.

(8) That the damages and injuries complained of were the result of an accident.

The court defined negligence, ordinary care, proximate cause, and "contributing proximate cause," and also defined contributory negligence. No objection was made to the charge as given.

In response to special issue No. 1, the jury found that the railroad was guilty of negligence in permitting the hole or ditch to be and remain on the crossing, and, in response to special issue No. 2, found that such negligence was not the proximate cause of the damages. Findings in response to the remaining issues are, in substance, as follows:

(3) J. K. Miller and wife, Mrs. Tinie Miller, and their daughter, Miss Pauline Miller, were guilty of negligence in being where they were at the time of the accident.

(4) (a) Immediately before and at the time of the occurrence, the occupants of the automobile were driving at a dangerous rate of speed under all the circumstances then and there existing, (b) and in so doing were guilty of negligence, (c) which was not the proximate cause of the damages and injuries complained of, but (d) was·a "contributing proximate cause" of such damages and· injuries.

(5) (a) That, in approaching the crossing, the plaintiffs did not exercise ordinary care in keeping a proper lookout, (b) which constituted negligence on the part of the occupants of the car, (c) which negligence was not the proximate cause of the damages and injuries, but was (d) a "contributing proximate cause" thereof.

(6) (a) That, at the time they approached the crossing, the occupants of the car failed to exercise ordinary care in operating the brakes of said automobile, (b) which constituted negligence, (c) and was not the proximate cause of the damages ' or injuries, but (d) was a "contributing proximate cause."

(7) That the damages and injuries complained of were the result of an accident in so far as the defendant railroad is concerned.

In response to issues Nos. 8 and 9, damages on account of personal injuries to Mrs. Miller were fixed at $1,000, and to the car were estimated at $221. Based upon this verdict, the court rendered a judgment that the plaintiffs take nothing.

It will be seen that the fifth ground of negligence charged to the defendant, viz. permitting the hole into which the appellants' car fell to be and remain upon the right of way, is the only ground submitted to the jury. The only grounds of contributory negligence on the part of the plaintiffs which the court submitted are the grounds hereinbefore numbered as 1, 5, and 6, relating to the dangerous rate of speed at which plaintiffs were traveling, the failure to properly operate the brakes on their car, failing to keep a proper lookout, and the issue of inevitable accident.

The appellants insist under several assignments that there is no evidence to support the jury's finding that the negligence of the

defendant in permitting the hole to be and remain on the right of way crossing was not the proximate cause of the injuries or to support the finding that the occupants of the car were driving too fast, that they failed to keep a proper lookout and did not properly operate the brakes on their car, and that such findings of the jury cannot support the judgment in behalf of the defendant, for the reason that the jury also found that said acts and omissions were not the proximate cause of the injury. It is further contended that, because the jury found that such acts or omissions on the part of the occupants of the car constituted negligence, `but that .neither of such acts of negligence was the proximate cause of the injury, such finding conflicts with the further finding by the jury in response to special issues 4 (d), 5 (d), and 6 (d), to the effect that such acts or omissions were "contributing proximate causes." So the contention is that the jury having found that such acts of negligence were not proximate causes is inconsistent with their further finding that they were "contributing proximate causes."

■■ The finding of the jury that the railroad was guilty of negligence in permitting the hole or ditch to be and remain on the crossing is sustained by the evidence. As we construe the language of Revised Statutes, arts. 6320 and 6327, the defendant company's failure to keep the crossing in such condition "as not to unnecessarily impair its usefulness" was negligence per se. Whether such negligence was the proximate cause of the injuries depends upon whether a new and independent cause intervened between such negligence and the injury itself. In response to other issues, the jury has found, in effect, that the negligence of the occupants of the car in the particulars above mentioned constituted such new and independent causes which broke the connection between the primary negligence of the defendant in permitting the hole to remain there and the injury. If an efficient, new, and independent cause intervened which was attributable to plaintiffs' contributory negligence, then the primary negligence charged becomes the remote and not the proximate cause. Van Velzer v. Houston Land & Trust Co. (Tex. Civ. App.) 16 S.W. (2d) 865; Magnolia Pet. Co. v. Cocke (Tex. Civ. App.) 3 S.W.(2d) 139; Seale v. Gulf C. & S. F. Ry. Co., 65 Tex. 274, 57 Am. Rep. 602; San Antonio & A. P. Ry. Co. v. Trigo (Tex. Civ. App.) 101 S. W. 254; Houston & T. C. Ry. Co. v. Gerald, 60 Tex. Civ. App. 151, 128 S. W. 166.

■ Finding numbered 3 by the jury, to the effect that the occupants · of the car were guilty of negligence in being where they were at the time of the accident, is. simply an expression of an opinion by the jury which is not 'based upon any facts previously found which would constitute negligence. The record shows that the plaintiffs were in the hole at the time of the accident. Whether that position constituted negligence depends upon the facts and circumstances under which they went into the hole. This finding is therefore insufficient to support a judgment for either party. The failure of the jury to find in this connection that plaintiffs being where they were at the time of the accident was not the proximate cause .thereof renders it insufficient as a basis for any judgment.

In response to special issues numbered 4, 5, and 6, the jury found that the occupants of the automobile were driving at a dangerous rate of speed under all the circumstances then existing, that, in approaching the crossing, plaintiffs did not exercise ordinary care in keeping a proper lookout, and that at the time they approached the crossing they failed to exercise ordinary care in operating the brakes of the automobile.

The record shows: That on the morning of the accident the plaintiffs had left Lubbock prior to '4 o'clock a. m., with the intention of going to Sherman, Tex., and if possible driving through in one day. State highway No. 7, upon which the accident occurred, runs parallel with the defendant's railway in a southeasterly direction; the highway being on the west side of the line of railway from Lubbock to Justiceburg in Garza county. That about 2 miles southeast of Justiceburg highway No. 7 turns east and crosses the appellee's right of way and continues in a southeasterly direction on the east side of the line of railway to Roscoe in Nolan county. That the occurrence which forms the basis of this suit was about 4 o'clock in the morning, at the point where said highway No. 7 turns east in crossing the railroad track and right of way. The maps and photographs show that the defendant's right of way northwest of this crossing is 100 feet in width, and that south of the crossing it is 200 feet wide. No complaint is made of the condition of the highway within the limits of the right of way on the west side of the track. On the east side of the track from 8 to 15 feet from the rails was a gully or hole estimated at from 5½ to 8 feet in depth and of varying width. This gully is shown to have been caused from rains and flood waters which flowed from the northwest down the defendant's right of way toward the southeast on the east side of the track and which ran under the road through a box culvert emptying into the hole. Across the south end of this culvert and along the north side of the hole a guard had been erected which consisted of three posts and three planks nailed thereon, and which was about 3½ feet in height and had been painted white. No guard rail had been erected either on the west or east side of the hole. Southeast of the hole the railway company had erected and maintained its cattle guards in the fence which connected its right of way fences on

either side of its property. According to the map, there was a passageway of about 15 feet between the guard rail and the connecting right of way fence, and in this passageway was the hole into which plaintiffs' car fell, causing the damages. The traveled portion of the road, which the witnesses say was maintained for the traveling public, was estimated to be between 16 and 20 feet in width, and it ran across the right of way and rails of the defendant north or northwest of the hole and the guard rail. It seems to be conceded that, if appellants had remained on the traveled portion of the road in making the crossing, they would have traveled to the left or north of the guard rail, and the hole and the accident would not have occurred, but the testimony is sufficient to show that the plaintiffs' daughter, Pauline, did not follow the traveled portion of the crossing, but just before crossing the rails of the track itself bore to the right in an effort to go between the painted guard rail and the painted cattle guards under the impression that that was the traveled road, and as a result drove her car into the hole.

The testimony bearing upon the issues of speed, keeping a lookout, and operating the brakes is, in substance, as follows:

Plaintiff J. K. Miller testified: "When we came down this highway in a southeasterly direction and came to this turn for the purpose of making this crossing and did turn at an angle of ninety degrees, this rail guard appeared to be on the left hand side of the road. The car went on the right hand side of this three-rail guard and went into the hole. * * * The car was equipped with headlights the same as an ordinary car, throwing the light straight ahead. When the car was running on a level, it would not throw the light into a deep hole no more than any other car would. It was not possible for me to see this hole before it was too late. It was not possible for us to see that we were driving into a hole before we drove into it in time to stop the car. It was not possible for us to drive in the night time with our car lights sending their rays straight ahead to see that the road went on the left hand side of the guard rail in time to stop the car from going into the hole. * * * Before we began to check up our car to make the turn, our car had been going at about thirty to thirty-five miles an hour. We began to slow down as soon as I noticed that there was a turn in the road. We slowed down quite a bit. I could not say just how much time we were making along there as we went over the crossing. I judge between fifteen and twenty miles an hour as we turned. * * * I was looking down the highway as we were going along. I was looking down the road the same way that Miss Pauline was driving most of the time but might have got my eyes off for a minute. * * * About

the turn as we got to the crossing I noticed that the car was beginning to slow down. I was not looking right at the time we got to the crossing to see how fast we were going but back there just a little bit back some piece I believe it must have been right along about where we passed that sign (800 feet) I had thrown the flash light on the board there and we were running about thirty-three miles an hour. That was back before we got to the crossing some three or four hundred yards. I could not say how much we had slowed down but we had slowed down considerable. I don't think that we ever attempted to stop. We slowed down some. We discovered that we were off of the road about the time we went over the tracks. We did not get off of the traveled part of the road very far back, fifteen feet maybe. Maybe not, so far. I had not noticed that we had gone off of the traveled portion of the road. We did not know it until we hit the railroad track. * * * "

Miss Pauline Miller, with reference to these issues, testified as follows: "I did not see or know of the hole or ditch in time to keep the car from falling therein. At the time I undertook to cross the railroad tracks I was watching where I was going and watching what I thought was the road. Before I got to the turn I slowed the car down, then I saw the cattle guard on the right and the highway guard on the right of the highway. I thought the road went between the two white fences. That is the way I drove the car—in between those fences and the hole happened to be just on the other side of the railroad. I could not see the hole before the car fell in it. When I went up on the railroad crossing, that threw the lights up. The hole was on the other side and naturally I could not see it. The lights of my automobile sent their rays straight ahead like any other automobile. As I entered upon the railroad tracks the hole was practically in front of me, the car pointing in an easterly direction. My car was apparently following the course of the road as best I could tell. As I entered upon the railroad tracks, the hole was apparently in front of me in the way the road was leading. I was following what I thought was the course of the road. I saw a guard of some kind consisting of two or three posts and rails beyond the railroad tracks at or about the time I passed over the railroad tracks. The guard appeared to be on the left hand side of the road to me. In undertaking to cross the railroad tracks my car was headed to the right of the aforesaid guard. I was undertaking to pass to the right of said guard and in attempting to pass to the right I drove into the hole. As the highway leads eastwardly from the railroad tracks it makes a sharp bend to the left after passing over the tracks. I have driven a car long enough to know approximately how much speed it is making. At the time I passed over

the tracks I would say the car was going between fifteen and eighteen miles per hour. I had checked the speed considerably in making the turn and before entering upon the railway tracks at the time I reached the railroad tracks I had it in absolute control. In making the turn at the curve where the dirt road turned to go over the railroad it is not a fact that I was on the extreme outside of the curve at the edge of the road. I could see the dirt road to the extent of the normal range of our lights. It is not true that as I went around the curve on the dirt road going on to the railroad that I was rounding the curve so fast and my car was so close to the outside edge of the road that I could not turn the car sufficient to keep in the road following its curve. The car did not leave the road at the curve. I did not leave the road on the outside of the curve as I turned to go over the railroad. So far as I knew at the time I went over the railroad tracks, the car did not leave the road. I did not discover that I was not on the road until I was crossing the railroad track. I could not see this situation before I got to it. The car did not leave the road and head for the bare rails as I turned the curve. I had slowed down sufficient to make the curve but was not attempting to stop because I was on what I thought was the road. I did not use the emergency brake in attempting to make this stop. The car did not leave the dirt road before I reached the railroad track. I don't know whether the imprints of the automobile after the accident show that the automobile had not been on the plank crossing where the dirt road crosses the railroad. After I examined the condition there in the daylight I found that the graded portion of the road passed to the north and east of the drainage ditch (hole) in question. The reason I did not stop my car before driving into the drainage ditch (hole) was because the distance between the railroad tracks and it was about twelve feet from the center of the track."

C. C. Brown, the defendant's roadmaster testified: That "if you were coming around that curve you could not see the hole if you were on the road. You could not see it if you were on the road in the night and if you stayed on the crossing. The jump-off into the hole is rather abrupt."

Newman Boles, automobile man at Lubbock, testified that the car in question was a Chrysler 70, with four-wheel brakes, and that the brakes were without defect so far as he knew. He further testified that you could stop such a car in good working order, when going at the rate of 15 miles an hour, within 12 or 15 feet.

Lester Miller, son of the plaintiffs, testified: That he was acquainted with his father's car and worked in the repair department of the Chrysler Motor Company a little over three years prior to the accident. That

he looked over the automobile in question before plaintiffs started on the trip, checking the steering gear and brakes, together with the lights, and that they were all in proper adjustment. He said: "I examined the tracks of the auto after they left the highway on the west side of the track. From my examination of those tracks, the brakes were, rather the wheels were under slight brake pressure. I would estimate that a car being driven fifteen miles with brakes properly adjusted, would stop within fifteen to eighteen feet. When going at the rate of twenty-five miles an hour, it could be brought to a sudden stop within about twenty-five to thirty feet and as the speed decreases the distance within which it can be stopped necessarily decreases."

G. S. Waldon, gravel pit man, said he saw the crossing soon after the accident. "The tracks (of plaintiff's car) left the highway about twenty or thirty feet from the railroad track. All I could tell from the tracks was that it looked like it was pretty good speed. That is my judgment about it. The tracks did not look much like the brakes had been applied before they got to the railroad track but afterwards it did. The top of the crown of the road is about sixteen to twenty feet wide. I think the car left the curve in the highway about thirty feet from the tracks of the railroad. I have had some experience in driving a Ford. I don't know how many accidents that I have known of at this crossing but there have been different ones, I don't know just how many. A bunch of negroes went off at the same place but I don't know of any others. I have known of several others."

F. M. Cockrum, an employee of the highway department, driving a Fordson maintainer, stated he pulled the car out of the ditch. From his examination he found: That plaintiffs' automobile had just missed the planks which make the crossing between the rails of the defendant's tracks, and that, on the west side where the car left the curve of the road, it threw the dirt out like it was going fast. That it left the dirt road close to the crossing. That the weather was dry. That there were crossing planks between the rails about 16 feet in length. That from his examination of the west side of the railroad it looked like the wheels were skidding or sliding, the dirt was shoved out, had been thrown out on making the curve. That by provision of the highway department the curves are elevated on the south side but not on the west side, and are built up that way on both sides of the road. That the elevation is on the outside of the respective curves. "I don't know what rate of speed these curves are elevated for on the dirt roads there on Highway No. 7. From my observation and experience in driving an automobile over them, I know that you can safely make them (the curves) at twenty-five or thirty miles. * * *

When you are approaching that crossing at a distance or at least making that curve around there, especially in the night time, it would be very difficult, if not impossible almost, to see that hole. Well, you could not see it if you were on the road. You would not see the hole if you were on the road not in the night if you stayed on the crossing. As you approach the crossing after making the turn on the west side of the railroad, you climb up a very little bit, it is up instead of down, but a very little bit. The lights from the automobile would likewise be pointed upward a little bit, instead of downward. Probably you would never see the hole with the lights. * * *"

J. K. Blankeney, an employee of the highway commission, testified that he was at the scene of the accident about 7:30 o'clock on that morning and said: "From my observation of the automobile tracks, as they turned out of the road, the brakes were not applied until they had done hit the railroad. As to whether or not the brakes had been applied up to the time the automobile reached the rails, I could not tell much about it."

▉▉▉▉ After a careful review of the statement of facts, we are convinced that there is an insufficiency of evidence, if any at all, to sustain the jury's findings with reference to excessive speed, failing to keep a lookout or to properly use the brakes. We recognize the rule that the jury are the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony, and that it is our duty to affirm a judgment if there is any evidence of probative force to sustain the verdict, but, before we can sustain a verdict and judgment, the evidence must amount to something more than mere inferences and guesses. It must be legally of some probative force. Mere detached statements of witnesses which may possibly furnish an argumentative basis are not controlling, nor do we understand that a jury is authorized to arbitrarily reject testimony, even of interested parties, that is unimpeached and is without suspicion, and then return a verdict contrary to such testimony where the evidence of said witnesses is uncontradicted as in this case.

According to the testimony of Pauline Miller, who was driving the car at the time of the accident, and the testimony of her father who occupied the front seat of the car, they were running at a speed of between 15 and 20 miles per hour. In rounding the curve before reaching the rails, according to the testimony of these witnesses, they were running at 20 miles per hour or less. Cockrum, an employee of the highway department whose business it was to run a maintainer over this section of the road and who was familiar with the condition of the curves and the crossing, described how the road was higher on the outer edges of the curves, and

stated from his experience that it was safe to drive a car at 30 or 35 miles an hour at that point. He did say that the road looked like the wheels of this car were skidding and sliding as the dirt was shoved out and had been thrown out by the wheels on making the curve. He does not express an opinion as to the rate of speed the car was going as evidenced by these facts, and, so far as the record shows, it may have been moving less than 30 or 35 miles, which he says was a safe rate of speed. This is the only testimony which tends in any degree to contradict the positive statements of Pauline Miller and her father, which shows that the car was not moving at a dangerous rate of speed. These witnesses also testified that they were both keeping a lookout, and this testimony is not denied by any other witness. The fact that Pauline saw the white guard rail and the white cattle guards is evidence of the fact that she was keeping a lookout and concluded that the road ran between these two objects. If the guard rail, instead of running east and west across the north end of the hole, had been built to run north and south on the west side of the hole, she would not have been misled. Of course, this issue was not submitted to the jury, and the position of the guard rail is not found as negligence. There is no direct testimony and no circumstances which, in our opinion, contradict the positive testimony of Pauline Miller and her father that they were keeping a look-out. As they went up on the track the rays from the lights of their car were naturally elevated and they were not able with any degree of diligence to see the hole in the right of way. The appellee's own witnesses admit that fact.

With reference to the operation of the brakes, these witnesses are uncontradicted. Both Pauline and her father say that she slowed down the car preparatory to making the curve; that she had previously been running about 33 miles an hour, and in making the curve and afterward was running between 15 and 20 miles. She says that she did not bear to the right and leave the traveled highway because she was running so fast that she could not make the turn, but she went to the right in an attempt to go between the guard rail and the cattle guard, because she thought that was the course of the road. No one has contradicted her testimony upon that point. Two of the appellee's witnesses testified that from the tracks of the car it did not appear that the brakes were on until after the car had crossed the rails and was headed for the ditch, but that the car tracks between the rails and the hole showed that the brakes had been thrown on. This corroborates her and contradicts the jury's finding that the brakes were not properly operated. She frankly admits that she did not use her emergency brake, and it is clear from the testimony of all the witnesses with

202

reference to the speed of the car that she had no time for such action. She says she did not realize she was off the beaten road until she struck the west rail. Then she threw on her brakes. If at that time she was traveling 30 miles an hour, by a simple calculation we know that she was going at the rate of 44 feet per second. If she was traveling at 15 miles per hour, being the lowest speed fixed by any of the witnesses, she was traveling at the rate of 22 feet per second. The edge of the hole was only 8 feet from the east rail. It may be reasonably inferred that with no amount of diligence could she have avoided plunging into the hole after she saw that she was off the beaten road. If the jury thought there was any testimony or circumstances which contradicted or tended to discredit the testimony of Pauline Miller or her father with reference to these two issues, they had the right to disregard it, but, in the absence of some testimony to the contrary, tending to establish contributory negligence in the particulars stated, they could not disregard the testimony of the young lady and her father and return a finding diametrically opposed to the rejected testimony. Starkey v. H. O. Wooten Gro. Co. (Tex. Civ. App.) 143 S. W. 692; Spurlock v. Zaring (Tex. Civ. App.) 270 S. W. 1099; Winter v. Morgan & Williams (Tex. Civ. App.) 256 S. W. 342; Dunlap v. Wright (Tex. Civ. App.) 280 S. W. 276; Grand Fraternity v. Melton, 102 Tex. 399, 117 S. W. 788; Dallas Hotel Co. v. Newberg (Tex. Civ. App.) 246 S. W. 754.

■■■■■■■ The court's definition of proximate cause is incomplete as applied to this case, in that it omits the element of new and independent cause intervening between the primary cause and the event causing the injury. If the court's definition of proximate cause is read in connection with his attempt to define "contributing proximate cause," the definition is sufficient. "Contributing proximate cause" is a new term which has lately been injected into the phraseology of the law of negligence, and should not have been defined. The expression is tautologous. It is difficult to conceive of a proximate cause of an injury which is not at the same time a contributing cause. There was no objection to this feature of the charge, and, while the court should not have used the term "contributing proximate cause" or attempted to define it separate and apart from the definition of proximate cause, the jury seems to have given due consideration to both definitions and found that the plaintiffs' negligence did not constitute the proximate cause, but was the contributing proximate cause, and because of these findings the appellants insist that the verdict is inconsistent and conflicting.

■■■■ In preparing charges, "the better practice is to follow settled precedents. It is always safer to lay down familiar rules in language universally adopted and approved than to undertake to give a new version in more doubtful language. So even though the Trial Judge as an original matter may be able to state a rule of law more concisely and in language more easily understood by the ordinary juror, such departures are to be avoided." 13 Stand. Proc. 805.

■■■■ When the jury has not been misled by the charge and a correct verdict has been reached, verbal inaccuracies will not necessarily work a reversal. Rand v. C. R. Johns & Son (Tex. Sup.) 15 S. W. 200.

■■■■ In view of another trial, it is proper for us to say that there is no evidence to sustain the action of the court in submitting the issue of unavoidable accident. The jury found that the railway company was guilty of negligence in permitting the hole to be and remain upon the right of way, and further found that the plaintiffs were guilty of contributory negligence. There is an unavoidable accident only where there is an absence of negligence. Texas Electric Ry. Co. v. Burt (Tex. Civ. App.) 272 S. W. 255.

■■■■ There is no merit in appellants' contention to the effect that Mrs. Miller is not chargeable with the negligence of her daughter. The uncontroverted evidence is that they were all going on a joint trip to visit relatives in Sherman, Tex., and Mrs. Miller knew that her daughter was driving at the time, and said it was with her consent because, it being still dark, her husband's eyes were affected by the lights of other cars which they met, and, under the circumstances, the daughter, Pauline, was the safest driver.

For the reasons stated, the judgment is reversed, and the cause remanded.