# JPMORGAN CHASE BANK *v.* TRAFFIC STREAM (BVI) INFRASTRUCTURE LTD.

No. 01–651.   Argued April 17, 2002—Decided June 10, 2002

SOUTER, J., delivered the opinion for a unanimous Court.

*Sarah L. Reid* argued the cause for petitioner. With her on the briefs were *Joseph N. Froehlich* and *Edward H. Tillinghast III.*

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Assistant Attorney General McCallum, Deputy Solicitor General Kneedler, Michael Jay Singer, Wendy M. Keats, William Howard Taft IV, James G. Hergen,* and *John P. Schnitker.*

*Craig J. Albert* argued the cause for respondent. With him on the brief was *Lauren K. Kluger.**

JUSTICE SOUTER delivered the opinion of the Court.

The question here is whether a corporation organized under the laws of the British Virgin Islands is a "citize[n] or subjec[t] of a foreign state" for the purposes of alienage diversity jurisdiction, 28 U. S. C. § 1332(a)(2). We hold that it is.

I

Respondent Traffic Stream (BVI) Infrastructure Ltd. is a corporation organized under the laws of the British Virgin Islands (BVI), an Overseas Territory of the United Kingdom.[1] In 1998, petitioner Chase Manhattan Bank, now JPMorgan Chase Bank, agreed to finance some ventures Traffic Stream had organized to construct and operate toll roads in China, with the parties' contract to "be governed by and construed in accordance with the laws of the State of New York," App. 85a. Traffic Stream agreed to "submi[t] to the jurisdiction" of federal courts in Manhattan, and to "waiv[e] any immunity from [their] jurisdiction." *Ibid.*

---

*Mark N. Bravin* and *Peter Buscemi* filed a brief for the Government of the United Kingdom of Great Britain and Northern Ireland as *amicus curiae* urging reversal.

[1] In 1998, the Government of the United Kingdom announced that its "'Dependent Territories'" would, from that point on, be known as "'Overseas Territories.'" Apparently the change of name implied nothing more. Lodging, Amended Brief for Government of United Kingdom of Great Britain and Northern Ireland as *Amicus Curiae* in No. 99–10385 (CA5), p. 7, n. 2 (available in Clerk of Court's case file).

Chase subsequently charged Traffic Stream with defaulting on its obligations. It sued in the United States District Court for the Southern District of New York, which found subject-matter jurisdiction under the alienage diversity statute, 28 U. S. C. § 1332(a)(2), and granted summary judgment to Chase. When Traffic Stream appealed, the United States Court of Appeals for the Second Circuit *sua sponte* raised the question whether Traffic Stream was a citizen or subject of a foreign state for the purposes of alienage diversity jurisdiction. The court relied on its precedent in *Matimak Trading Co.* v. *Khalily*, 118 F. 3d 76 (1997), in answering that because Traffic Stream was a citizen of an Overseas Territory and not an independent foreign state, jurisdiction was lacking. 251 F. 3d 334, 337 (2001). The judgment of the District Court was reversed, and the case ordered to be remanded with instructions to dismiss the complaint. *Ibid.* Chase was denied rehearing en banc.

Because the Second Circuit's decision conflicts with those of other Circuits, see *Southern Cross Overseas Agencies, Inc.* v. *Wah Kwong Shipping Group Ltd.*, 181 F. 3d 410, 413 (CA3 1999); *Koehler* v. *Dodwell*, 152 F. 3d 304, 308 (CA4 1998); *Wilson* v. *Humphreys (Cayman) Ltd.*, 916 F. 2d 1239, 1242–1243 (CA7 1990), and implicates serious issues of foreign relations, we granted certiorari, 534 U. S. 1074 (2001). We now reverse.

II

Title 28 U. S. C. § 1332(a)(2) provides district courts with "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between . . . citizens of a State and citizens or subjects of a foreign state." A "corporation of a foreign State is, for purposes of jurisdiction in the courts of the United States, to be deemed, constructively, a citizen or subject of such State." *Steamship Co.* v. *Tugman*, 106 U. S. 118, 121 (1882). Cf. Restatement (Third) of Foreign Relations Law of the United States § 213 (1986) ("For purposes of international

law, a corporation has the nationality of the state under the laws of which the corporation is organized"). In spite of this general rule of corporate citizenship, this case presents two issues about the application of the statute to Traffic Stream: whether Traffic Stream has been incorporated under the laws of a "foreign state" given the BVI's status as an Overseas Territory, and whether the BVI's corporate citizens are "citizens or subjects" within the meaning of § 1332(a)(2).

## A

The argument that the status of the BVI renders the statute inapplicable begins by assuming that Traffic Stream, organized under BVI law, must be a citizen or subject of the BVI alone. Since the BVI is a British Overseas Territory, unrecognized by the United States Executive Branch as an independent foreign state, it is supposed to follow that for purposes of alienage jurisdiction Traffic Stream is not a citizen or subject of a "foreign state" within the meaning of § 1332(a)(2).

Even on the assumption, however, that a foreign state must be diplomatically recognized by our own Government to qualify as such under the jurisdictional statute (an issue we need not decide here), we have never held that the requisite status as citizen or subject must be held directly from a formally recognized state, as distinct from such a state's legal dependency. On the contrary, a consideration of the relationships of the BVI and the recognized state of the United Kingdom convinces us that any such distinction would be entirely beside the point of the statute providing alienage jurisdiction.

### 1

The current BVI Constitution was established when the Crown of the United Kingdom, in the exercise of power granted by the West Indies Act, 1962, c. 19, § 5(1), issued the Virgin Islands (Constitution) Order 1976, SI 1976/2145. Under that order, the United Kingdom exercises pervasive

authority over the territory. The Constitution provides, for example, that the BVI Government shall include a Governor and Deputy Governor appointed by the Queen to "hold office during Her Majesty's pleasure," *id.*, pt. II, § 3(1), an Executive Council mainly appointed by the Governor on the basis of the popular election for the Legislative Council, §§ 14–15, and a Legislature comprising the Queen and a Legislative Council of mainly popularly elected representatives, §§ 25–26.

Bills take effect as laws only when approved by the royally appointed Governor or by the Queen acting through a Secretary of State, § 42. The Governor is instructed to withhold assent from any bill that may conflict with the laws of the United Kingdom or is "likely to prejudice the Royal prerogative." § 42(2)(b). The Queen, acting through a Secretary of State, has authority to annul any BVI statute, § 43(1), and "[t]here is reserved to Her Majesty full power to make laws for the peace, order and good government of the Virgin Islands," § 71. "[I]f the Legislative Council fails to pass . . . a Bill or motion . . . the Governor may, at any time that he thinks fit, . . . declare that such Bill or motion shall have effect as if it had been passed . . . ." § 44.

The Crown's representatives have not slept on their powers, which have recently been exercised to impose laws and international obligations upon the territory, as in the Caribbean Territories (Abolition of Death Penalty for Murder) Order 1991, and the Merchant Shipping (Salvage Convention) (Overseas Territories) Order 1997, the latter of which brought the BVI into compliance with the International Convention on Salvage, 1989. In a very practical sense, then, the statutes that permit incorporation in the BVI, see BVI Companies Act (CAP. 285); BVI International Business Companies Act (CAP. 291), are laws enacted in the exercise of the political authority of the United Kingdom, and it seems fair to regard a BVI company as a citizen or subject of this ultimate political authority. This view of the relationship

seems especially reasonable when such a corporation is engaged in an international transaction, since the United Kingdom acts on the BVI's behalf in the international arena. See 6 Halsbury, Laws of England ¶ 983, p. 471 (4th ed. 1991) ("Her Majesty's government in the United Kingdom is internationally responsible for the external affairs of United Kingdom dependent territories"); see also United Nations Act, 1946, c. 45 (empowering the Crown to bring "His Majesty's dominions" into compliance with directives of the United Nations Security Council).

2

The Second Circuit nonetheless takes the position that the relationship between the United Kingdom and its territories is "too attenuated" for the United Kingdom to be viewed as a governing authority for purposes of the relationship assumed by § 1332(a)(2). *Matimak Trading Co.*, 118 F. 3d, at 86. This, of course, depends upon the statute's objective.

Both during and after the Revolution, state courts were notoriously frosty to British creditors trying to collect debts from American citizens, and state legislatures went so far as to hobble British debt collection by statute, despite the specific provision of the 1783 Treaty of Paris that creditors in the courts of either country would "meet with no lawful impediment" to debt collection. Definitive Treaty of Peace, United States-Great Britain, Art. IV, 8 Stat. 82. See Holt, "To Establish Justice": Politics, the Judiciary Act of 1789, and the Invention of the Federal Courts, 1989 Duke L. J. 1421, 1438–1449. Ultimately, the States' refusal to honor the treaty became serious enough to prompt protests by the British Secretary of State, particularly when irked by American demands for treaty compliance on the British side. See 31 Journals of the Continental Congress, 1774–1789, pp. 781–784 (J. Fitzpatrick ed. 1934).

This penchant of the state courts to disrupt international relations and discourage foreign investment led directly to the alienage jurisdiction provided by Article III of the Con-

stitution. See U. S. Const., Art. III, § 2 (federal jurisdiction "extend[s] to . . . Controversies . . . between a State, or the Citizens thereof, and foreign States, Citizens or Subjects"). "[T]he proponents of the Constitution . . . made it quite clear that the elimination or amelioration of difficulties with credit was the principal reason for having the alienage and diversity jurisdictions, and that it was one of the most important reasons for a federal judiciary." Holt, *supra,* at 1473. This is how James Wilson put it during the debates at the Pennsylvania ratification convention:

> "Let us suppose the case, that a wicked law is made in some one of the states, enabling a debtor to pay his creditor with the fourth, fifth, or sixth part of the real value of the debt, and this creditor, a foreigner, complains to his prince . . . of the injustice that has been done him. . . . Bound by inclination, as well as duty, to redress the wrong his subject sustains . . . [h]e must therefore apply to the United States; the United States must be accountable. 'My subject has received a flagrant injury: do me justice, or I will do myself justice.' If the United States are answerable for the injury, ought they not to possess the means of compelling the faulty state to repair it? They ought; and this is what is done here. For now, if complaint is made in consequence of such injustice, Congress can answer, 'Why did not your subject apply to the General Court . . . ?'" 2 Debates on the Federal Constitution 493 (J. Elliot ed. 1876) (hereinafter Elliot's Debates).

Wilson emphasized that in order to "extend our manufactures and our commerce" there would need to be a "proper security . . . provided for the regular discharge of contracts. This security cannot be obtained, unless we give the power of deciding upon those contracts to the general government." *Id.,* at 492. His concerns were echoed by James Madison: "We well know, sir, that foreigners cannot get justice done

them in these courts, and this has prevented many wealthy gentlemen from trading or residing among us." 3 *id.*, at 583. Madison also remarked that alienage jurisdiction was necessary to "avoid controversies with foreign powers" so that a single State's courts would not "drag the whole community into war." *Id.*, at 534; see also The Federalist No. 80, p. 536 (J. Cooke ed. 1961) (A. Hamilton) ("[A]n unjust sentence against a foreigner [may] be an aggression upon his sovereign" rendering alienage jurisdiction "essential to . . . the security of the public tranquility").

Thus, the First Congress granted federal courts the alienage jurisdiction authorized in the Constitution, even while general federal-question jurisdiction was withheld. See Judiciary Act of 1789, ch. 20, §11, 1 Stat. 78 (providing for jurisdiction where "an alien is a party" and more than $500 in controversy). The language of the statute was amended in 1875 to track Article III by replacing the word "aliens" with "citizens, or subjects," Act of Mar. 3, 1875, 18 Stat. 470, the phrase that remains today. Although there is no need here to decide whether the current drafting provides jurisdiction up to the constitutional hilt, cf. *Tennessee* v. *Union & Planters' Bank,* 152 U. S. 454 (1894) (despite similar language, federal-question jurisdiction under 28 U. S. C. §1331 does not extend as far as Article III), there is no doubt that the similarity of §1332(a)(2) to Article III bespeaks a shared purpose.

The relationship between the BVI's powers over corporations and the sources of those powers in Crown and Parliament places the United Kingdom well within the range of concern addressed by Article III and §1332(a)(2). The United Kingdom exercises ultimate authority over the BVI's statutory law, including its corporate law and the law of corporate charter, and it exercises responsibility for the BVI's external relations. These exercises of power and responsibility point to just the kind of relationship that the Framers believed would bind sovereigns "by inclination, as well as duty, to redress the wrong[s]" against their nationals, 2 El-

liot's Debates 493 (J. Wilson).  See J. Jones, British National-
ity Law and Practice 288 (1947) ("It is the practice of His
Majesty's Government in the United Kingdom to protect, as
against foreign Powers, . . . [c]orporations owing their exist-
ence to the law in force in the United Kingdom and colo-
nies").  Any doubters may consult the United Kingdom's
own filings in this matter and others comparable, which ex-
press apprehension that expulsion of corporations like Traffic
Stream from federal courts would cloud investment opportu-
nity and raise the sort of threat to "the security of the public
tranquility" that the Framers hoped to avoid.  See, *e. g.,*
Brief for Government of United Kingdom of Great Britain
and Northern Ireland as *Amicus Curiae;* Diplomatic Note
No. 13/2000 from British Embassy in Washington, D. C., to
U. S. State Dept., Feb. 2, 2000, Lodging 29, p. 1 (available in
Clerk of Court's case file); Diplomatic Note No. 90/2001 from
the British Embassy in Washington, D. C., to the U. S. State
Dept., Oct. 5, 2002, App. to Motion to File Brief as *Amicus
Curiae* for Government of United Kingdom of Great Britain
and Northern Ireland 1a.

### B

Traffic Stream's alternative argument is that BVI corpora-
tions are not "citizens or subjects" of the United Kingdom.
Traffic Stream begins with the old fiction that a corporation
is just an association of shareholders, presumed to reside
in the place of incorporation, see, *e. g., Tugman,* 106 U. S.,
at 120–121, with the result that, for jurisdictional purposes,
a suit against the corporation should be understood as a suit
against the shareholders, see *id.,* at 121.  Traffic Stream pro-
ceeds to read the British Nationality Act, 1981, as a declara-
tion by the United Kingdom that BVI residents are not its
citizens or subjects, but mere "nationals," without the rights
and privileges of citizens or subjects, such as the right to
travel freely within the United Kingdom.  See I. Macdon-
ald & N. Blake, Macdonald's Immigration Law and Practice
in the United Kingdom 130–131 (4th ed. 1995) (describing

categories of United Kingdom citizenship).[2] Traffic Stream insists that because it is legally nothing more than a collection of noncitizen individuals, the corporation itself cannot be treated as deserving of access to the courts of the United States under a statute that opens them to foreign citizens and subjects.

The less important flaw in the argument is its reliance on the outdated legal construct of corporations as collections of shareholders linked by contract, see M. Horwitz, The Transformation of American Law 1870–1960, pp. 69–93 (1992), a view long since replaced by the conception of corporations as independent legal entities, see *id.*, at 93–107.[3] Thus, Traffic Stream's whole notion of corporate citizenship derived from natural persons is irrelevant to jurisdictional enquiry in the United States today.

But the argument's more significant weakness is its failure to recognize that jurisdictional analysis under the law of the United States is not ultimately governed by the law of the United Kingdom, whatever that may be. While it is perfectly true that "every independent nation [has the inherent right] to determine for itself . . . what classes of persons shall be entitled to its citizenship," *United States* v. *Wong Kim Ark*, 169 U. S. 649, 668 (1898), our jurisdictional concern here is with the meaning of "citizen" and "subject" as those

---

[2] Ironically, in passing the British Nationality Act, 1981, c. 61, § 36, the United Kingdom identified one goal as "reducing statelessness."

[3] Indeed, Congress itself rejected the earlier rule in 1958 when it provided that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U. S. C. § 1332(c)(1). There has been raised some question as to whether § 1332(c) applies to foreign, as well as domestic, corporations, although those Circuits that have reached the issue are in agreement that § 1332(c) extends to alien corporations. See *Danjaq, S. A.* v. *Pathe Communications Corp.*, 979 F. 2d 772, 773–774 (CA9 1992); *Vareka Investment, N. V.* v. *American Investment Properties, Inc.*, 724 F. 2d 907, 909 (CA11 1984); *Jerguson* v. *Blue Dot Investment, Inc.*, 659 F. 2d 31, 35 (CA5 1981). There is no need for us to weigh in on this point.

terms are used in § 1332(a)(2). In fact, we have no need even to decide whether Traffic Stream's reading of the British Nationality Act is wrong, as the United Kingdom says it is,[4] but only whether the status Traffic Stream claims under the Nationality Act would so operate on the law of the United States as to disqualify it from being a citizen or subject under the domestic statute before us here. We think there is nothing disqualifying.

Although the word "citizen" may imply (and in 1789 and 1875 may have implied) the enjoyment of certain basic rights and privileges, see Black's Law Dictionary 237 (7th ed. 1999) (defining "citizen" as "entitled to enjoy all its civil rights and protections" of a community), a "subject" is merely "[o]ne who owes allegiance to a sovereign and is governed by that sovereign's laws," *id.*, at 1438. Thus, contrary to Traffic Stream's view, the text of § 1332(a)(2) has no room for the suggestion that members of a polity, under the authority of a sovereign, fail to qualify as "subjects" merely because they enjoy fewer rights than other members do. For good or ill, many societies afford greater rights to some of its members than others without any suggestion that the less favored ones have ceased to be "citizens or subjects." And although some persons, like resident aliens, may live within a foreign state without being treated under American law as members of that particular polity, cf. *Wong Kim Ark, supra,* at 660 ("'children . . . born in a place . . . then occupied . . . by conquest, are still aliens'"), Traffic Stream concedes that BVI citizens are at least "nationals" of the United Kingdom. See Brief for Respondent 25. Given the object of the alienage statute, as explained earlier, there is no serious question that "nationals" were meant to be amenable to the jurisdiction of the federal courts, leaving it immaterial for our purposes that the law of the United Kingdom may provide different rights of abode for individuals in the territories.

---

[4] See Brief for Government of the United Kingdom of Great Britain and Northern Ireland as *Amicus Curiae* 12–13.

## III

Because our opinion accords with the positions taken by the Governments of the United Kingdom, the BVI, and the United States, the case presents no issue of deference that may be due to the various interested governments. It is enough to hold that the United Kingdom's retention and exercise of authority over the BVI renders BVI citizens, both natural and juridic, "citizens or subjects" of the United Kingdom under 28 U. S. C. § 1332(a). We therefore reverse the judgment of the Court of Appeals.

*It is so ordered.*