# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-2932

LEAR CORPORATION,

*Plaintiff-Appellant*,

v.

JOHNSON ELECTRIC HOLDINGS LIMITED and NEVADA BOND INVESTMENT CORP. II,

*Defendants-Appellees*.

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 02 C 6704—**Joan Humphrey Lefkow**, *Judge*.

———————

ARGUED DECEMBER 4, 2003—DECIDED DECEMBER 30, 2003

———————

Before BAUER, EASTERBROOK, and EVANS, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. In 1999 Lear Corporation, which specializes in automotive interiors, purchased UT Automotive, Inc. (UTA), the automotive operations of United Technologies Corporation, through an intermediary called Nevada Bond. Lear spun off UTA's electrical motors division to Johnson Electric Holdings Ltd. while retaining the balance of the business. Automobile and motors businesses come with risks of environmental liability, given their reliance on long-lasting fluids that can leak and reach the ground. The transactions therefore included reciprocal

agreements to indemnify. Nevada Bond promised to cover any environmental costs associated with "a discontinued operation . . . or assets no longer used . . . by UTA" as of the closing, plus any other environmental liabilities of which it then had notice. Lear promised to indemnify Nevada Bond for all subsequently arising environmental liabilities. Lear and Johnson Electric agreed to parallel arrangements. Lear believes that, with respect to the electrical-motors assets, all past, present, and future liabilities have been apportioned between Johnson Electric and Nevada Bond, so that even if Lear should be held liable (because it is in the chain of title), one or the other must indemnify it. But this generality does not identify *which* of the two must pay. Each may insist that the other is responsible, leaving Lear at risk in the meantime—and holding the bag, if either should become insolvent.

Two years after Johnson Electric acquired United Technologies' electric-motor business, a suit was filed in Columbus, Mississippi. The plaintiffs contend that hazardous substances have leaked from UTA's automobile-parts- manufacturing facility, which Johnson Electric now owns. The complaint named Lear, Nevada Bond, and Johnson Electric among the defendants. Lear and Nevada Bond took the position that, because the Columbus plant is still operating, and there was no actual knowledge as of 1999 of environmental problems, all liability (if there turns out to be any) rests with Johnson Electric. Lear asked Johnson Electric to assume the defense of the suit and to admit responsibility for indemnity. But Johnson Electric contended that Lear (and thus Nevada Bond) had retained the liability because any leaks came from "assets" that were no longer in use by 1999, even though an operational plant exists at the site. Johnson Electric declined to provide Lear with either defense or indemnity.

With Nevada Bond and Johnson Electric each insisting that the other bears any liability, Lear filed this action

against both under the diversity jurisdiction, asking the court for a declaratory judgment that one or the other must assume the defense of the Mississippi litigation and pick up the tab at the end. The district court dismissed the action to the extent that Lear sought relief against Johnson Electric, see 2003 U.S. Dist. LEXIS 9132 (N.D. Ill. May 30, 2003), and then entered a partial final judgment under Fed. R. Civ. P. 54(b), so that Lear could take an immediate appeal. The district court concluded that, while the Mississippi litigation is pending, it is premature to determine which firm must indemnify Lear. And although the dispute about defense is ripe, the judge held that Johnson Electric has an option to take over the defense (in order to protect its interests from missteps by Lear, which lacks much interest in the outcome) but not an obligation to do so. Lear does not contest the latter holding on appeal but contends that it is entitled to an immediate decision about indemnity.

Neither the parties nor the district judge devoted much attention to what must be the first issue in every federal suit: subject-matter jurisdiction. Lear is a Delaware corporation with its principal place of business in Michigan. Nevada Bond is a Nevada corporation with its principal place of business in Connecticut (United Technologies' home state). So far, so good. But Johnson Electric is a foreign entity "limited by shares" under Bermuda law with its principal place of business (which is to say, its corporate headquarters) in China. Until we raised the issue at oral argument, everyone had assumed that a Bermuda "limited" organization is just like a U.S. corporation, so that jurisdiction is supplied by 28 U.S.C. §1332(a)(3), which covers suits between "citizens of different States and in which citizens or subjects of a foreign state are additional parties". That depends on thinking of Johnson Electric as the "citizen." Perhaps, however, a Bermuda "limited" organization is similar to a U.S. limited liability company, which like a

partnership is disregarded for purposes of determining citizenship. Instead courts look to the citizenship of all partners or investors. See *Carden v. Arkoma Associates*, 494 U.S. 185 (1990); *Cosgrove v. Bartolotta*, 150 F.3d 729 (7th Cir. 1998). We directed the parties to file post-argument briefs discussing how "limited" entities organized under Bermuda law should be classified for purposes of the diversity jurisdiction.

Counsel did not get the point. The parties' joint memorandum discusses such questions as whether a Bermuda corporation is a "subject[ ] of a foreign state"—to which the answer is yes, given Bermuda's status as an overseas territory of the United Kingdom, see *JP Morgan Chase Bank v. Traffic Stream (BVI) Infrastructure Limited*, 536 U.S. 88 (2002); *Universal Reinsurance Co. v. St. Paul Fire & Marine Insurance Co.*, 312 F.3d 82, 86 (2d Cir. 2002)—but not whether Johnson Electric's legal attributes classify it as a "corporation." The memorandum does not discuss *Carden* or *Cosgrove*. But it does include a copy of Bermuda's Companies Act 1981, so we were able to do the research ourselves. This statute shows that a business organization "limited by shares" under Bermuda law is equivalent in all legally material respects to a corporation under state law. It is an entity with perpetual existence, governed by a Board of Directors, able to issue tradable shares (which Johnson Electric has done; they trade on the Hong Kong Stock Exchange), and treated as independent of its equity investors—who are neither taxable on its profits nor liable for its debts. Johnson Electric, rather than the investors, therefore is a "citizen" for purposes of U.S. law, and complete diversity exists.

Lear, Nevada Bond, and Johnson Electric agreed that their transactions would be governed by Delaware law. Delaware courts postpone adjudication about indemnity "until there is a judgment against the party seeking it."

*Dana Corp. v. LTV Corp.*, 668 A.2d 752, 756 (Del. Ch. 1995). That Delaware defers this kind of adjudication is not conclusive on a federal tribunal; perhaps Delaware requires more by way of ripeness than do federal courts. The potential for different treatment would be clear if Delaware issued advisory opinions; then the willingness of Delaware's judiciary to tackle an issue would not imply that federal courts should (or could) do likewise in diversity litigation. Just so when the difference runs in the other direction. Whether a dispute has reached the stage at which a declaratory judgment under 28 U.S.C. §2201 is appropriate is a question of federal practice. Cf. *Mayer v. Gary Partners & Co.*, 29 F.3d 330 (7th Cir. 1994). As it happens, though, there is no interesting difference between federal and Delaware approaches. We regularly say that decisions about indemnity should be postponed until the underlying liability has been established. See, e.g., *Nationwide Insurance Co. v. Zavalis*, 52 F.3d 689, 693 (7th Cir. 1995) ("[T]he duty to indemnify is not ripe for adjudication until the insured is in fact held liable in the underlying suit."); *Grinnell Mutual Reinsurance Co. v. Reinke*, 43 F.3d 1152, 1154 (7th Cir. 1995) ("[T]he duty to indemnify is unripe until the insured has been held liable."); *Travelers Insurance Cos. v. Penda Corp.*, 974 F.2d 823, 833 (7th Cir. 1992) ("[T]he determination of whether [defendant] has a duty to indemnify is not ripe until the underlying litigation is terminated.")

A declaration that A must indemnify B if X comes to pass has an advisory quality; and if the decision would not strictly be an advisory opinion (anathema under Article III) it could be a mistake, because it would consume judicial time in order to produce a decision that may turn out to be irrelevant. Declaratory decisions about indemnity differ in this respect from the more common decision that an insurer has a duty to defend the client in ongoing litigation. Defense may be required even if there never turns out to be

any liability to indemnify; and a court that has devoted considerable effort to determining the scope of a defense obligation to resolve the parties' immediate dispute may find it prudent to specify the scope of an indemnity duty at the same time if that subject also is in debate. Here, by contrast, the judge found that Johnson Electric did not have any duty to defend Lear in the Mississippi litigation, which made it less attractive to try to wade into the parties' debate about indemnity—and impossible for an appellate court to say that the district judge abused her discretion by steering clear for now.

Lear (and thus Nevada Bond) has retained any liability attributable to "a discontinued operation . . . or assets no longer used . . . by UTA" as of the transfer date in 1999. According to Lear, this clause does not apply because manufacturing is ongoing at the plant in Columbus, Mississippi, and Johnson Electric therefore must assume the liability. Johnson Electric reads the language differently, as distinguishing between an "operation" (and its associated assets) and the whole plant. So if the Columbus plant made a product that is no longer sold, and the production line for that product led to the pollution, then Lear and Nevada Bond retain the liability: that particular manufacturing operation is discontinued and the assets may have been sold off. The dispute, in other words, concerns the level of generality at which to read the words "operation" and "assets." Do they cover whole plants, or do they refer instead to products, production lines, or even particular machines? It seems unlikely that by throwing away a leaky pipe, and thus discarding one asset, Johnson Electric could fob a substantial liability off on Nevada Bond; that would not be a sensible reading of the contract. But it may well be sensible to read this language as providing that Nevada Bond retains liability for major production facilities that were closed before the sale in 1999, even if other facilities at the same site remain operational.

Determining the meaning of the words "operation" and "assets" may require the court to learn a good deal about the economic context of this transaction (and the businesses in which United Technologies and Johnson Electric engage), and perhaps to probe the bargaining history of the transactions to learn whether the parties exchanged views about this subject. The endeavor would be unnecessary if the plaintiffs in Mississippi fail to show that the grounds are contaminated, or if it turns out that any leaks came from ongoing operations. Only if the Mississippi litigation ends in liability stemming from pollution caused by production facilities that were closed before the sale in 1999 will the current dispute require resolution. Waiting to see the outcome in Mississippi may be aggravating for Lear, but it has value from the judiciary's perspective—and that is one permissible consideration in the declaratory-judgment calculus. No one has a legal *entitlement* to declaratory or other equitable relief in circumstances such as these.

All well and good, Lear allows, but it insists that it suffers an *unconditional* loss that could be alleviated now by a declaratory judgment: it must pay counsel to carry on the litigation in Mississippi. That cost should be shifted to Johnson Electric immediately, Lear submits. Yet this is just an effort to create a defense obligation though the back door. As the district court held, the contract gives Johnson Electric an option but not a duty to defend Lear in any environmental litigation. This also means that Johnson Electric need not underwrite the ongoing costs of Lear's defense. Perhaps, once the Mississippi litigation is over, any legal expenses will be deemed part of the sum covered by the indemnity; the agreement defines "Covered Liabilities" to include the costs and expenses of litigation. But no duty to defend means no duty to pay for the outlays of defense on a current basis. Payment abides the decision about indemnity. If Lear wants to escape these ongoing expenses, all it

has to do is roll over and play dead in the Mississippi litigation. Either Nevada Bond or Johnson Electric must pay in the end, so Lear has no real risk unless it is that one of these parties might become unable to pay when the time comes; and the prospect of Lear's default might induce one or both of these to take up the defense after all. It is to guard against such an eventuality, which might lead to a default judgment that one or the other would be compelled to pay, that the contract creates an option to displace Lear and take over the litigation. Nevada Bond and Johnson Electric already are parties in Mississippi, so they might quickly pick up the torch if Lear should choose to lay it down. By volunteering an unnecessary defense in Mississippi, Lear cannot compel a federal court in Chicago to undertake a premature adjudication about indemnity.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*