## In re KILGORE MEADOWBROOK COUNTRY CLUB, INC.

### No. 03–61702.

United States Bankruptcy Court,
E.D. Texas,
Tyler Division.

Sept. 9, 2004.

---

Jerry L. Beane, Andrews & Kurth, L.L.P., Dallas, TX, Jason R. Searcy, Jason R. Searcy, P.C., Longview, TX, for Debtor and Debtor–in–Possession, Kilgore Meadowbrook Country Club, Inc.

Andrew G. Khoury, Andrew G. Khoury, P.C., Longview, TX, William Sheehy, Wilson, Sheehy, Knowles, Robertson & Cornelius, P.C., Tyler, TX, for Jim and Victoria Eggers and JVE Corporation, Claimants.

## *MEMORANDUM OF DECISION*

BILL G. PARKER, Chief Judge.

This matter is before the Court to consider the "Second Supplemental Objection to Proof of Claim No. 28 As Amended and Objection to Proof of Claim No. 42 Filed by JVE Corporation and Jim and Victoria Eggers" [docket # 85] and the "Debtor's Objection to the Proof of Claim Filed by Jim and Victoria Eggers" [docket # 86] each filed in the above-referenced case by the Debtor and Debtor–in–Possession, Kilgore Meadowbrook Country Club, Inc. (the "Debtor" or the "Club"). A hearing was initially held on April 27, 2004, regarding the Debtor's objection to the amended claim (# 40) of JVE Corporation ("JVE") with each party appearing and presenting argument.[1] At the conclusion of the April hearing, the parties were provided with an opportunity to submit supplemental briefing. In addition to the submission of a brief, claim # 42 was filed as an amendment to claim # 40, though its only modification was to expand the listing of named claimants to include Jim and Victoria Eggers as co-claimants with JVE.[2] The Debtor responded with its supplemental objections to the allowance of this amended claim [docket # 86]. In order to insure a comprehensive treatment of this series of amended claims and objections, the Court deferred a ruling on the Debtor's initial objection until the hearing could be conducted on the objection to amended claim # 42. That hearing occurred on July 14, 2004, at which time the Court took all matters under advisement. This memorandum of decision disposes of all issues pending before the Court.[3]

### *Factual Background*

Prior to 1997, Jim and Victoria Eggers were members of the Debtor, Kilgore Meadowbrook Country Club, Inc. In 1997, Ms. Eggers became an officer and director

1. Along with the Debtor's claims objection, the Court also heard the "Joint Motion For Estimation of Claim for Voting Purposes" filed by JVE and Jim Eggers on January 5, 2004.

2. Jim Eggers had also filed an individual proof of claim on January 2, 2004, *see* proof of claim # 31 in the amount of $72,355.59, although this claim was subsequently withdrawn on January 19, 2004. Mrs. Eggers testified that no portion of the $72,355.59 included in claim # 31 was included in the $110,343.79 claimed under claims ## 40 and 42 (*i.e.*, there was no overlap in the amounts claimed by the individuals).

3. This Court has jurisdiction to consider these matters pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a). The Court has the authority to enter a final order in these contested matters since they constitute core proceedings as contemplated by 28 U.S.C. § 157(b)(2)(A), (B), and (O).

of the Debtor, initially serving in the capacity of club secretary. Then, in 1998, at a time when the Debtor was experiencing financial distress due to circumstances which led to the termination of its general manager, the board of directors requested Ms. Eggers to become the president and general manager of the Club. Ms. Eggers accepted but refused to take any compensation for the rendition of such services.

Upon assuming the position of general manager, Ms. Eggers quickly discovered that the financial books and records of the Debtor were in a chaotic condition. She enlisted at her own personal expense the assistance of her personal accountants, Thraikill & Thrailkill, CPAs, to create for the Club a basic accounting system capable of generating and producing financial statements for the Club's management and membership. She further discovered that the cash flow of the Club was sporadic and that circumstances often arose in which the existing funds of the Club were insufficient to meet its payroll or to address other immediate financial obligations.

Thus, at various junctures during her tenure as president and general manager when such financial crises arose, Ms. Eggers voluntarily placed personal funds into the general operating account of the Debtor enabling the Club to timely meet its financial obligations. The means by which such cash was tendered into the Debtor was through checks drawn upon the bank account of JVE Corporation, a corporation wholly owned by Ms. Eggers and her husband, Jim Eggers, in which she had always served as an officer and director.[4] The Club's records clearly indicate that its board of directors knew and accepted the series of cash deposits volunteered by Ms. Eggers through which the Club was able to maintain ongoing operations for the benefit and enjoyment of its members at various times when it otherwise likely could not have done so. It does not appear as if the Club's board knew (or perhaps cared) that the cash infusions were actually being accomplished through checks drawn on JVE's corporate bank account, even though copies of those checks were maintained in the Club's offices and were available for inspection. No written promissory note was ever executed between the parties.

Ms. Eggers served as president and general manager from 1998 through June, 2002. Even her adversaries in this dispute acknowledge her successful management of the Club in that time period and the record clearly establishes that no allegation of any type of negligence, mismanagement, or breach of fiduciary duty has ever been made against Ms. Eggers arising from her tenure as President/GM of the Debtor.

However, a dispute subsequently arose over the characterization of the cash deposits which Ms. Eggers had tendered to the Club during her managerial tenure. For this reason and perhaps due to other conflicts or reasons which were not clearly articulated in the record, Ms. Eggers resigned her position as the Debtor's president and general manager in June 2002. The dispute over this apparent indebtedness was the subject of pre-petition litigation between the parties which was pending at the time of the filing of the Debtor's voluntary petition under Chapter 11 on August 18, 2003.[5]

---

4. *See* JVE's Ex. P–23–P–44, P–47—P–53. The corporate name is obviously derived from the initials of Jim and Victoria Eggers.

5. Actually, though the lawsuit styled *JVE Corporation d/b/a Cross Creek Ranch v. Kilgore Meadowbrook Country Club, Inc., f/k/a Roy H. Laird Country Club, Inc.* and pending before the 188th Judicial District Court of Gregg

As framed before this Court, the Debtor primarily argues that the claim asserted by JVE and the Eggers in this proceeding constituted a gift which the Debtor has no obligation to repay. Because of the repeated assurances made by Ms. Eggers that the Club need not worry about the timing of any repayment of the tendered funds, certain board members of the Debtor testified before this Court that they believed that the deposited sums were in the nature of a gift or a donation by Ms. Eggers in order to secure the benefits of a nice country club. However, Ms. Eggers has maintained that, though she was admittedly willing during her tenure to delay repayment of the advanced sums until the Debtor regained a firmer financial footing, such sums always constituted a loan—not a gift—to the Debtor.

### Discussion

 A proof of claim, if it is executed and filed in accordance with the Federal Rules of Bankruptcy Procedure, constitutes *prima facie* evidence of the validity and amount of that claim, FED. R. BANKR. P. 3001(f), and is deemed allowed unless a party in interest objects under 11 U.S.C. § 502(a).[6] Rule 3001 generally sets forth the requirements for filing a proof of claim, and one of those requirements states that:

> when a claim ... is based on a writing, the original or a duplicate shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement

of the circumstances of the loss or destruction shall be filed with the claim. FED. R. BANKR.P. 3001(c).

Likewise, if a creditor claims a security interest in property of the debtor, Rule 3001(d) requires the creditor to accompany his proof of claim with evidence that the creditor perfected a security interest.

 Hence, the burden of persuasion under the bankruptcy claims procedure always lies with the claimant, who must comply with FED. R. BANKR. P. 3001 by alleging facts in the proof of claim that are sufficient to support the claim.[7] If the claimant satisfies these requirements, the burden of going forward with the evidence then shifts to the objecting party to produce evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. *See Lundell v. Anchor Const. Specialists, Inc. (In re Lundell)*, 223 F.3d 1035, 1041 (9th Cir. 2000); *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. BAP 2000). Such probative evidence might include the production of specific and detailed allegations that place the claim into dispute, *see In re Lenz*, 110 B.R. 523, 525 (D.Colo. 1990); the presentation of legal arguments based upon the contents of the claim and its supporting documents, *see In re Circle J Dairy*, 112 B.R. at 300; or through pretrial pleadings, such as a motion for

County, Texas, was initially filed by both the Eggers and JVE, the Eggers had nonsuited their individual claims at the time of the filing of the bankruptcy petition.

**6.** A proof of claim, however, does not qualify for that *prima facie* evidentiary effect if it is not executed and filed in accordance with the Bankruptcy Rules. *See First Nat'l Bank of Fayetteville v. Circle J. Dairy (In re Circle J Dairy, Inc.)*, 112 B.R. 297, 300 (W.D.Ark. 1989).

**7.** If, however, the claimant fails to allege facts in the proof of claim that are sufficient to support the claim, *e.g.* by failing to attach sufficient documentation to comply with FED. R. BANKR.P. 3001(c), the claim is not automatically disallowed; rather, it is merely deprived of any *prima facie* validity which it could otherwise have obtained. *See In re Los Angeles Int'l Airport Hotel Assoc.*, 196 B.R. 134, 139 (9th Cir. BAP 1996).

summary judgment, in which evidence is presented which brings the validity of the claim into question, *see In re Frontier Airlines, Inc.*, 112 B.R. 395, 399–400 (D.Colo.1990). If the objecting party meets this evidentiary requirement, then the burden of going forward with the evidence shifts back to the claimant to sustain its ultimate burden of persuasion to establish the validity and amount of the claim by a preponderance of the evidence. *See In re Consumers Realty & Development Co.*, 238 B.R. 418 (8th Cir. BAP 1999); *In re Allegheny International, Inc.*, 954 F.2d 167, 173–74 (3d Cir.1992).

In the present case, the Court found at the April 27, 2004, hearing that any *prima facie* validity that might otherwise have attached to claim # 28 had been rebutted by the Debtor. Hence, JVE and/or the Eggers must bear the burden of persuasion to establish the validity of the $110,343.79 claim by a preponderance of the evidence.[8] *See In re Los Angeles Int'l Airport Hotel Assoc.*, 196 B.R. at 139. In that regard, there is no dispute that sums equivalent to the claim amount were tendered to the Debtor and that the Debtor utilized those sums in its ongoing business operations. The claim objections, once distilled, present three basic issues: (1) what is the proper characterization of the money tendered to the Debtor: loan (debt) or gift; (2) if a debt exists, has the proper party timely filed an appropriate claim for repayment of the indebtedness; and (3) if such a claim has been filed, is collection of that debt somehow precluded by applicable law?

### Loan or Gift?

The claims brought by JVE and the Eggers are based upon the characterization of these cash transfers as a series of unsecured loans which remain unpaid by the Debtor—a characterization which is, in fact, consistently supported by the financial statements which were routinely presented to the Debtor's management. Those financial documents, though some were admittedly produced by Ms. Eggers' accountants, clearly and repeatedly identify an obligation owing from the Debtor to the Eggers under an entry entitled "N/P—Jim and Victoria Eggers."[9] and that characterization was, in fact, continued by the Debtor's subsequent accountants, Hope & McDonald, CPAs, which similarly referenced the debt under the entry "Note Payable—Jim and Victoria Eggers" until directly instructed by the Board to change the characterization.[10] These financial statements containing that consistent characterization of these transactions were routinely distributed at the various meetings of the Debtor's board of directors during this period, thereby providing repeated notice to the Debtor's Board that the Eggers expected repayment at some point for their advances to the Debtor. Additional informational materials were provided at various times to the Debtor's entire membership which provided clear reference of the existence of the indebtedness and the Eggers' intent to collect.[11]

---

8. JVE was the sole claimant at the time of the April 27, 2004, hearing. However, as discussed *infra*, claim # 28 was amended by # 42 which asserted Mr. and Ms. Eggers as additional co-claimants.

9. *See* JVE's Ex. P–1—P–9, P–11—P–16.

10. *See* JVE's Ex. P–18—P–20.

11. *See* JVE's Ex. P–76 Financial Position of the Club dated February 10, 1998 ["The club could not meet payroll, and Jim and Victoria Eggers loaned the club over $21,000 to pay the employees."], P–85 Letter From the President (Victoria Eggers) sometime in 1998 ["(T)he Club's only debt is $23,000 that my husband and I loaned the Club last year."].

These and other documents also reflect that it was the Debtor's intent as well, at least during Ms. Eggers' managerial tenure, to repay these obligations at some future time. For example, the board minutes for May 18, 1999, reflect that the Board discussed its various liabilities, including "$60,000.00 due to Jim and Victoria Eggers." [12] The debt owed to Jim and Victoria Eggers was also subsequently discussed by the Debtor's Board, at the very least, at meetings on August 17, 1999,[13] on October 19, 1999,[14] and on December 19, 2001.[15] In addition to the clear and repeated characterization of this obligation as a loan both in documents routinely presented to the Board and in subsequent minutes arising from its meetings, there is no evidence that any board member ever questioned the validity of that characterization during Eggers' tenure.[16] Instead the minutes repeatedly reflect an understanding and acknowledgment by the Board that an outstanding financial obligation was owed to the Eggers.[17] The evidence further establishes that various board members made repeated inquiries of Ms. Eggers regarding the Eggers' continued willingness to defer repayment of the obligation owed to them.

Conversely, there is no credible evidence that the sums advanced to the Debtor were intended by Ms. Eggers as gifts.[18] There was certainly no documentary evidence offered by the Debtor to support its contention. There was only the testimony of a few of its directors that they "assumed" that the deposits into the Debtor's accounts were gifts. Yet not one of those witnesses demonstrated that such "assumptions" were ever publicly discussed during Ms. Eggers' tenure nor did they testify that such assumptions were based upon any actual statement or documentation from Ms. Eggers that referenced the transfers as gifts. Rather, they claimed to have inferred that conclusion from the fact that Ms. Eggers was not aggressively asserting her rights to repayment but was instead consistently reassuring the directors that no repayment of the debt was necessary so long as the Club had other pressing financial obligations. The only director who testified affirmatively that he always believed that the transfers were gifts was Charles Gauntt, a banker who served as the secretary of the Debtor during a portion of the time that these transfers were being tendered and discussed. However, he offered such testimony in direct contradiction of several sets of minutes which he himself authored and submitted to the Board during this

---

12. *See* JVE's Ex. P–59.

13. *See* JVE's Ex. P–61 ["The board discussed taking bids from the local finical (sic) institutions for long term financing to repay the land purchase note *and to repay Jim and Victoria Eggers.*"] (emphasis added).

14. *See* JVE's Ex. P–62 ["The board discussed the long term debt of the club for the land purchase, notes payable to Regions Bank, *and loans payable to Jim and Victoria Eggers.*"] (emphasis added). These minutes are erroneously labeled as November 16, 1999, but the body of the minutes correctly reflects that the meeting occurred on October 19, 1999.

15. *See* JVE's Ex. P–65 ["It was reported that the Club owes Jim & Victoria Eggers $30,000 which was lent to pay severance and bring bills current."]; *see also* P–74 ["Loan by V. Eggers: $30,000 to bring bills to date & severance pay; $19,000.00 (for) 2001 taxes due in January."].

16. *See* JVE's Ex. P–55—P–74.

17. *See* JVE's Ex. P–59, P–61, P–62 and P–65.

18. Actually the Eggers did make periodic gifts to the Debtor including computers and copiers, as well as jewelry and trips for use at fundraising auctions. At no time have the Eggers asked for repayment or reimbursement from the Club for such gifts.

time period which clearly denominated the transfers as debt.[19] As a banker, Mr. Gauntt clearly knows the difference between a loan and a gift, yet he seeks to persuade this Court that he intended to say "gift" every single time that he referenced the existence of a "loan" from the Eggers in the board minutes. Such testimony simply lacks any credibility.

Therefore, because the evidence clearly indicates that both parties to this series of transactions reasonably understood that the transfers of money from Ms. Eggers would have to be repaid at some point, the Court finds that these transfers are properly characterized as a loan to the Debtor corporation and that the Debtor's objection to the allowance of the claim based upon a characterization that these transfers were gifts rather than loans must be overruled.

*Presentation and Collection of the Claim*

With the conclusion that the cash transfers to the Debtor constituted loans, certain questions remain: (1) to whom is such indebtedness owed; (2) has such party timely presented a claim in this proceeding; and (3) is the collection of that debt precluded by applicable law? There is no dispute that the Debtor took the cash offered and spent it in the ordinary course of its business, nor that such cash transfers into the Debtor corporation were accomplished through the negotiation of checks signed by Ms. Eggers but drawn upon the bank account of *JVE Corporation d/b/a Cross Creek Ranch.*[20] The evidence also clearly establishes that the Debtor and its management believed that the cash deposits which it had accepted had created a debtor-creditor relationship solely with the Eggers. Such a relationship is consistently documented in the Debtor's records and corporate minutes, and the evidence further documents that the Debtor never acknowledged the existence of, much less acknowledged any financial relationship with, any entity called JVE Corporation.[21] It never acknowledged any debt to JVE. It never authorized nor ratified any borrowing from JVE. Thus, there is little dispute that the indebtedness reflected in claims # 28 and # 40 was actually owed by the Debtor to the Eggers, specifically to Ms. Eggers, and not to JVE.[22]

19. *See* JVE's Ex. P–59, P–61, P–62.

20. *See supra,* note 4.

21. Though the JVE checks were apparently available at the Debtor's offices, the testimony establishes that it is very unlikely that anyone associated with the Debtor, other than Ms. Eggers and her assistant Kathy Jones, ever saw the JVE checks or otherwise knew that Ms. Eggers had accessed the funds from the JVE account.

22. The claimants at the April hearing, prior to the submission of claim # 48, argued that an agency relationship existed between JVE and Ms. Eggers and that, in an agency context, a third party (the Debtor) who contracts with an agent (Ms. Eggers) is liable to the agent's principal (JVE), even if that principal remained undisclosed during the underlying transaction. *See, e.g., Owen v. King,* 130 Tex. 614, 619, 111 S.W.2d 695, 698 (Tex.Com.App. 1938). However, the Court cannot reach the undisclosed principal issue since the claimants failed to prove the foundational issue of the existence of an agency relationship between JVE and Ms. Eggers. Under Texas law, an agency relationship will not be presumed, and the party asserting that an agency relationship exists has the burden to prove its existence by a preponderance of the evidence. *Moore v. Office of the Attorney Gen.,* 820 S.W.2d 874, 877 (Tex.App.-Austin 1991, no writ); *Ross v. Texas One Partnership,* 796 S.W.2d 206, 209–10 (Tex.App.-Dallas 1990, writ denied); *Winter v. Morgan & Williams,* 256 S.W. 342, 344 (Tex.Civ.App.-Amarillo 1923, no writ) ["The law never presumes agency; it is always a fact to be proved, and the person who alleges it has the burden of proving it by a preponderance of the evidence."]. "In proving the existence of an agency relationship, it is essential to show that the alleged principle [sic] has both the

Accordingly, JVE does not possess a valid claim against the Debtor's estate.[23] Yet, perhaps because funds were drawn from a JVE account, the $110,343.79 claim was filed by the Eggers before the bar date only in the name of JVE.[24] The claim was subsequently amended on April 29, 2004, to include the Eggers individually as co-claimants, but only after the Court's inquiries at the April hearing regarding the proper ownership of the claim. Thus, the Court is presented with the question of whether to allow the amendment of the claim timely filed by JVE in order to allow the designation of the proper claimant, Ms. Eggers, notwithstanding the intervening passage of the claims bar date. The Debtor objects to the allowance of this amendment, arguing its reliance upon the bar date and that the amendment would cause actual prejudice to its interests.

■■■■ "Ordinarily, amendment of a proof of claim is freely permitted so long as the claim initially provided adequate notice of the existence, nature, and amount of the claim as well as the creditor's intent to hold the estate liable." *Unioil, Inc. v. H.E. Elledge (In re Unioil, Inc.)*, 962 F.2d 988, 992 (10th Cir.1992). As the First

---

right (1) to assign the agent's task, and (2) to control the means and details of the process by which the agent will accomplish the assigned task." *Schultz v. Rural/Metro Corp. of New Mexico*, 956 S.W.2d 757, 760 (Tex.App.-Houston 1997); *see also Lyons v. Lindsey Morden Claims Management, Inc.*, 985 S.W.2d 86, 90 (Tex.App.-El Paso 1998, pet. denied); *Johnson v. Owens*, 629 S.W.2d 873, 875 (Tex. App.-Fort Worth 1982, writ ref'd n.r.e.). An agency relationship may be shown by direct testimony or by circumstantial evidence showing "the relationship of the parties and their conduct concerning the transaction at hand." *Spangler v. Jones*, 861 S.W.2d 392, 397 (Tex.App.-Dallas 1993, writ denied), *quoted in Schultz*, 956 S.W.2d at 760; *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 356–57 (5th Cir.2003) ["An agency relationship may be demonstrated by 'written or spoken words or conduct, by the principal, communicated either to the agent (actual authority) or to the third party (apparent authority).'"] (*citing Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 181 (5th Cir. 1989)). Again, nothing connects JVE to this transaction other than the checks. The fact that Ms. Eggers was an officer, shareholder, and director of JVE at the time does not alone establish that she was acting as an agent of JVE when she made the various loans to the Debtor. Likewise, the fact that JVE is a subchapter S corporation for federal taxation purposes has no impact on this analysis.

**23.** This eliminates the basis upon which the Debtor sought to void the contractual claim under the Texas "interested director" statute and argue that collection of the debt was precluded. The interested director statute is found at TEX. BUS. CORP. ACT ANN. art. 2.35–1 (Vernon 2003) and, though it is often cited as a statute defining prohibited conduct, the statute actually defines conditions under which a corporation's officers or directors *may* conduct transactions with the corporation without violating their fiduciary duties to that corporation. Generally speaking, Texas law considers a corporate officer or director to be "interested" if one:

(1) makes a personal profit from a transaction by dealing with the corporation or usurps a corporate opportunity;

(2) buys or sells assets of a corporation;

(3) transacts business in his officer's or director's capacity with a second corporation of which he is also an officer or director or is significantly financially associated; or

(4) transacts business in his officer's or director's capacity with a family member. *Landon v. S & H Marketing Group, Inc.*, 82 S.W.3d 666, 673 (Tex.App.-Eastland 2002, no pet. h.); *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719–20 (5th Cir.1984). Though not raised by the Debtor, it is important to note that the statute is not invoked by the prosecution of the claim by Ms. Eggers because, in the only potentially applicable context, she did not stand to make a personal profit from her loans to the Debtor—because the loans were interest-free.

**24.** The claims bar date established in this case was February 14, 2004.

Circuit has observed, this standard can be judged by evaluating three criteria:

> First, the proposed amendment must not be a veiled attempt to assert a distinctly new right to payment as to which the debtor estate was not fairly alerted by the original proof of claim. Second, the amendment must not result in unfair prejudice to other holders of unsecured claims against the estate. Third, the need to amend must not be the product of bad faith or dilatory tactics on the part of the claimant.

*Gens v. Resolution Trust Corp.*, 112 F.3d 569, 575 (1st Cir.1997) (*citing Woburn Associates v. Kahn (In re Hemingway Transp., Inc.)*, 954 F.2d 1, 10 (1st Cir. 1992)); *accord, In re Kolstad*, 928 F.2d 171, 175 (5th Cir.1991) [holding that late-filed amendments to a timely proof of claim must be "liberally permitted to cure a defect in the claim as originally filed, to describe the claim with greater particularity or to plead a new theory of recovery on the facts set forth in the original claim," so long as such amendments do not "set forth wholly new grounds of liability."] (*quoting In re Int'l Horizons, Inc.*, 751 F.2d 1213, 1216 (11th Cir.1985)).

■ In this instance, the same right of payment asserted by JVE in the original claim is now sought to be asserted by Ms. Eggers in the amended claim. Its *content* has not been altered by the requested amendment. There is no credible argument that the Debtor's estate was not "fairly alerted" to the existence of this singular claim and its liability thereunder.

Though it is undoubtedly true that JVE was the source of funds utilized by Ms. Eggers to infuse the desperately needed funds into the Debtor corporation and that Ms. Eggers' declaration that "I am JVE" is legally inaccurate,[25] the Debtor should not be allowed to utilize that legal misperception to deny its responsibility to recognize the validity of the indebtedness. It cannot credibly deny that it was Ms. Eggers who contributed the funds by simply noting that there were not formal transfers from JVE to Ms. Eggers and then correspondingly from Ms. Eggers to the Debtor's coffers. The evidence establishes that, due to the existence of various financial crises, time was of the essence in each of those transfers and that the Debtor readily accepted them and directly benefited from them. The evidence further establishes that Ms. Eggers was the party who agreed to deposit funds into the Debtor at no interest to keep it afloat. She obviously had control and custody over the JVE bank account and any accountability issues arising from Ms. Eggers' appropriation and use of the JVE funds can only be addressed by those with an interest in JVE. It should not, and it does not, provide a hatch by which the Debtor can escape the recognition and the treatment of this debt by characterizing it as a new right of payment from that originally set forth in the JVE claim.

■ Because no evidence of bad faith or improper tactics arising from Ms. Eggers' submission of the amended claim was presented,[26] the Debtor relies upon the

---

**25.** As recognized by the Supreme Court, "[a] basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474, 123 S.Ct. 1655, 1660, 155 L.Ed.2d 643 (2003); *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 89, 122 S.Ct. 2054, 2056, 153 L.Ed.2d 95 (2002) [recognizing that corporations are "independent legal entities"].

**26.** Again, the surprise to Ms. Eggers was apparent at the conclusion of the April hearing when, notwithstanding her honest, if ill-founded, belief that she "was JVE," the Court began to question the proper ownership of the claim.

argument that the proposed amendment should be rejected because its recognition would subject the Debtor and its estate to unfair prejudice. Yet the Debtor mistakenly believes that unfair prejudice can be established merely by the fact that the estate will be required to pay a claim that it might have otherwise eluded. Two circuit courts of appeal have recognized the fallacy of that argument. In *Gens v. Resolution Trust Corp.*, the debtor argued that

> allowing the ... amendment prejudices unsecured creditors, who may receive less under any reorganization plan than would have been received were the [amended] claim not allowed. But the standard [the Debtor] proposes would preclude virtually any amendment, since it dispenses with the requirement that the debtor or trustee show "unfair" prejudice. Thus, something more than mere creditor disappointment is required to preclude amendment.

*Gens v. Resolution Trust Corp.*, 112 F.3d at 575.

Similarly, in *In re Stoecker*, 5 F.3d 1022 (7th Cir.1993), the Seventh Circuit overturned a bankruptcy court's disallowance of a claim amendment on the basis of unfair prejudice to creditors. As the *Stoecker* court concluded,

> The bankruptcy judge thought there was harm to other creditors because if the bank's claim is allowed, the entitlements of the unsecured creditors will be cut down. This is a misunderstanding of what it means for an error to be harmful in the sense of "prejudicial," that is, entitling the person harmed to complain.

> To say that an error is prejudicial means not that if the error is corrected someone will lose, which is almost always true, but that the error itself imposed a cost, as by misleading someone. Obviously there will be losers if the bank's claim is allowed, because the pool of assets available to the other creditors will be diminished, but the fact that the proof of claim failed to comply with Rule 3001 did not mislead or otherwise harm anyone.

5 F.3d at 1028 (emphasis added).

In precisely the same sense, there is no unfair prejudice which will result from the amendment of the claim to substitute Ms. Eggers for JVE. There is no unfair prejudice to the interests of unsecured creditors. It is a legitimate unsecured claim against this estate and no solicitation of any proposed treatment of any unsecured claim has yet been sought or authorized. Nor does the allowance of the amendment cause any unfair prejudice to the Debtor itself since it was not deprived of its ability to fully and fairly defend the Eggers' claim.[27]

Therefore, since none of the three prohibitions/exceptions to the general right to amend claims are present in this instance, Ms. Eggers' amended claim # 42 should be permitted unless the collection of that debt is otherwise precluded by applicable law. *See Gens*, 112 F.3d 569, and *In re Unioil*, 962 F.2d 988 [each affirming the allowance of claim amendments seven and nine months after the bar date, respectively, in order to correct the identification of the claimholder].[28] The Debtor asserts that,

---

**27.** Though the identical nature of the bases undergirding both the original JVE claim and the amended Eggers' claim suffices to meet this standard, the Court actually held the subsequent hearing in July to allow the Debtor to present any and all defenses to the amended claim—defenses which the Court has found to be unavailing.

**28.** The allowance of the requested amendment in this context also comports with the "well accepted" rule that "the bankruptcy court is guided by the principles of equity,

even if the transaction is properly characterized as a loan, it cannot be held liable for that loan to Ms. Eggers because: (1) there was never any formal corporate resolution authorizing the borrowing of money from her; and (2) any collection of the remaining indebtedness by Ms. Eggers is barred by the applicable statute of limitations. Both arguments are groundless.

 While there is no dispute that no corporate resolution authorizing the borrowing of sums from Ms. Eggers was ever passed by the Debtor's Board, there is also no dispute that the Debtor's Board happily accepted, and continued to recognize for a substantial period of time, the sums lent to the corporation by Ms. Eggers which were undisputedly utilized in the ongoing operations of its business and which provided crucial relief at times of significant financial distress. Under such circumstances, Texas courts have historically recognized that a corporation will be deemed to have ratified the transaction and cannot thereby deny liability for such indebtedness because of a lack of formal approval by the board of directors. *See Beef Industries, Inc. v. Bruer*, 516 S.W.2d 716, 720 (Tex. Civ.App.-Amarillo 1974, no writ) [recognizing that when a corporation receives checks at various intervals and the board of directors is made aware that such checks are considered loans by the lending party and are subsequently recognized as such by the directors at a board meeting, the board will be deemed to have ratified the transactions and the corporation will not be permitted to deny liability on the theory of lack of formal approval by the

board]; *Almar–York Co. v. Fort Worth Nat'l Bank*, 374 S.W.2d 940, 942 (Tex.Civ. App.-Fort Worth 1964, writ ref'd n.r.e.) ["Generally, if a corporation accepts the benefit of a contract or acquiesces therein with knowledge, it impliedly ratifies it. If the directors had knowledge of a contract, or if the facts are such as to justify the presumption that they did have knowledge, then a failure to disaffirm amounts to ratification."].[29]

 The Debtor's reliance upon the applicable statute of limitation must also fail. Collection of a claim on a debt under Texas law is generally subject to a four-year statute of limitations. TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(a)(3). The state court petition seeking to collect this indebtedness was filed against the Debtor on November 5, 2002,[30] and, therefore, only those loans initiated prior to November 5, 1998, could potentially be barred by the statute of limitations. However, in this instance, all of the loans tendered to the Debtor prior to November 5, 1998, were repaid by the two partial repayments (totaling $55,000.00) which the Eggers received in November 1999 and February 2001. *See, e.g., Watson v. Cargill, Inc.*, 573 S.W.2d 35, 39 (Tex.Civ.App.-Waco 1978, writ ref'd n.r.e.) [holding that, in determining the application of limitation periods, "[i]t is the settled rule that where there is a running account with various items of charges and credits occurring at different times, and no direction of payment has been made by the debtor, payments on the account as a whole are ap-

and ... the court will act to assure that 'substance will not give way to form, [and] that technical considerations will not prevent substantial justice from being done.'" *See In re Gens*, 112 F.3d at 576 (*quoting Pepper v. Litton*, 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939)).

**29.** The theories of estoppel or unjust enrichment might also preclude such a corporation from denying liability in such circumstances. See 20 ROBERT W. HAMILTON, TEXAS PRACTICE: BUSINESS ORGANIZATIONS § 586 (1973 & Supp. 2002).

**30.** *See* JVE's Ex. P–99.

plied by law to the oldest unpaid portion of the account." (*citing Prowell v. Berry–Barnett Grocery Co.*, 462 S.W.2d 53, 54 (Tex.Civ.App.-Waco 1970, writ ref'd))]; *Emmord's Inc. v. Obermiller*, 526 S.W.2d 562, 569 (Tex.Civ.App.-Corpus Christi 1975, writ ref'd n.r.e.). Thus, collection of the remaining portions of the indebtedness documented by claim # 42 in this instance is not barred by the applicable statute of limitations.

For the foregoing reasons, the Court finds that the Debtor's objections to claims # 40 filed by JVE Corporation and to amended claim # 42 filed by JVE Corporation, Jim Eggers and Victoria Eggers are sustained in part and overruled in part, such that claim # 42 is hereby allowed as an unsecured claim against this Estate owed to Victoria Eggers in the amount of $110,343.79. Any assertion of a claim by JVE Corporation or Jim Eggers is disallowed. Because of the Court's ruling as to the specific claims owed by the Estate in this context, the "Joint Motion For Estimation of Claim for Voting Purposes" filed by JVE and Mr. Eggers is dismissed as moot.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law [31] pursuant to Fed.R.Civ.P. 52, as incorporated into contested matters in bankruptcy cases by Fed. R. Bankr.P. 7052 and 9014. A separate order will be entered which is consistent with this opinion.

---

**31.** To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.